# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Vasquez, 2012 IL App (2d) 101132**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SANDRA VASQUEZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-1132 |
| Filed | June 4, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated driving under the influence resulting in 5 deaths and her sentence to 15 years' imprisonment were upheld over her contentions that section 11-501(d)(2)(G) of the Illinois Vehicle Code, the provision allowing probation only in "extraordinary circumstances," is unconstitutionally vague and that her sentence was excessive, since section 11-501(d)(2)(G) is not so vague that persons of common intelligence are required to guess at its application and the legislative objective of limiting the court's discretion to impose probation guides application of the section, and in defendant's case, the trial court did not abuse its discretion in finding that the circumstances were not "extraordinary" and did not require probation, regardless of the many tragic elements. |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 07-CF-67; the Hon. Clint T. Hull, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Thomas A. Lilien and Sherry R. Silvern, both of State Appellate Defender's Office, of Elgin, for appellant.

Eric C. Weis, State's Attorney, of Yorkville (Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justices McLaren and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1    On June 30, 2010, defendant, Sandra Vasquez, was convicted of 16 counts of aggravated driving under the influence (DUI) (625 ILCS 5/11-501(d)(1)(C), (d)(1)(F) (West 2006)) and 5 counts of reckless homicide (720 ILCS 5/9-3(a) (West 2006)). The trial court sentenced her to 15 years' imprisonment. Defendant appeals, arguing that: (1) section 11-501(d)(2)(G) of the Illinois Vehicle Code (Code) (625 ILCS 5/11-501(d)(2)(G) (West 2008))[1] is unconstitutionally vague; and (2) her 15-year sentence is excessive. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The issues on appeal pertain primarily to sentencing. However, for context and as the underlying facts of this case are largely undisputed, we briefly summarize the evidence presented at trial.

¶ 4                                        A. Trial

¶ 5    On February 10, 2007, defendant was a 23-year-old, single mother of two young children (ages five years and six months). Defendant was a certified nurse assistant who worked with Alzheimer's patients at a nursing home. At around 10:30 p.m., after putting her children to bed, defendant drove her younger sister, Vanessa (age 18), to their aunt's house, in Boulder Hill. There, and without permission, their 18-year-old cousin held a party in the basement.

---

[1]Between the date of the offenses (2007) and the date of sentencing (2010), section 11-501(d)(2) was amended, effective June 1, 2008, by Public Act 95-578. The language relevant to this appeal remained unchanged, but the Public Act broke section 11-501(d)(2) into subsections. Thus, for ease of reference, we refer in this opinion to section 11-501(d)(2)(G), the provision challenged on appeal and in effect at the time of defendant's sentencing.

Defendant testified that there was no party going on when she dropped off Vanessa. Because she had a 1 a.m. curfew, Vanessa told defendant that she would call later for a ride home.

¶ 6        After dropping off Vanessa, defendant decided not to go all the way home; instead, around 11 p.m., she went to another aunt's house, a few blocks away, where she visited with her aunt and Anna, her cousin's girlfriend. While visiting, defendant drank one beer and a "Jaeger-bomb" (a shot of Jaegermeister mixed with a Red Bull energy drink). Defendant opened a second beer, but she could not recall whether she finished it. Between 12:30 and 1 a.m., defendant and Anna left to pick up Vanessa. Defendant testified that she did not feel or exhibit any signs of being under the influence of alcohol.

¶ 7        When they arrived at the Boulder Hill residence, a house party was underway. Defendant and Anna sat in the car in the driveway, but Vanessa called defendant and asked her to come inside the house because there was a girl causing "trouble." Defendant went inside to help and found that there were approximately 30 to 40 people between the ages of 14 and 23 drinking alcohol and smoking marijuana at a "makeshift bar" set up in the basement. According to Vanessa, when defendant arrived, she did not exhibit any signs of being under the influence of alcohol.

¶ 8        Defendant looked around and noticed Joshua Dillon, a boy whom she did not know, sitting on the couch; he appeared to be drunk and "passed out." Defendant felt bad for Dillon, roused him, and took him outside, where he vomited. Defendant then brought Dillon back inside. Defendant started picking up bottles and cleaning up; her aunt and her aunt's boyfriend returned home and yelled for everyone to leave. Defendant went to speak with her aunt and her aunt's boyfriend; they testified that defendant did not smell of alcohol or appear to be under the influence. The people in the basement started making telephone calls and trying to arrange for rides home. Dillon approached defendant, told her that his ride had left him and that he lived just over one block away, and asked her for a ride home. Defendant again felt bad for Dillon, and she agreed to drive him home.

¶ 9        Defendant drove a four-door Infiniti sedan. When she went outside, she saw that her car was filling up with minors claiming that they were all going to the same place as Dillon. Vanessa and defendant both testified that defendant said, "you guys need to get out, we don't fit," but that the passengers were laughing, saying that they were going to the same place, and generally not paying attention to defendant. Defendant testified that she did not wish to argue with them. Vanessa was upset that defendant did not have room for her or Anna and was, instead, giving other people a ride. Defendant explained that, as a mother, she hoped that, if her kids were at a party and needed a ride, somebody else would do the same for them.

¶ 10        In total, nine people rode inside defendant's car. Defendant, Matthew Frank, and Katie Merkel (who sat on Frank's lap) sat in the two front bucket seats. Arielle Rexford, Robert Larsen, Jr., Josh Dillon, and James McGee sat in the backseat with Jessica Nutoni and Tiffany Urso sitting on their laps. Defendant reiterated that she tried to get some of the teenagers to exit the car, but that no one would get out. Nevertheless, defendant agreed that it was not safe to drive with that many passengers in the car, that she was the only adult in the vehicle, and that her vehicle's left headlight was out.

¶ 11        Defendant estimated that she drove away at around 1:30 or 1:45 a.m. Defendant testified

that it was difficult to drive with so many passengers. There was confusion about where they were going, loud music, and conversation. Defendant testified that she has "a lead foot" and "usually drive[s] pretty fast." Defendant agreed that it is not safe to drive fast. She did not know how fast she was driving that night, because there was a picture of her children by her speedometer. While driving south on Route 31 in Oswego near River Run Boulevard, defendant felt a bump from the backseat. She quickly turned to her right, over her shoulder, to see what had happened. When she turned back around, she saw headlights coming toward her. Defendant quickly swerved to the left; her car skidded across Route 31, crossed the median and northbound lane of traffic, and hit a utility pole.

¶ 12    At around 2:20 a.m., emergency personnel were dispatched to a single-car accident with injuries and ejections at the crash site. The fates of the car's occupants were as follows:

1. Frank (age 17): killed on impact;

2. Merkel (age 14): killed on impact;

3. Nutoni (age 15): killed on impact;

4. Urso (age 16): killed on impact;

5. McGee (age 14): died seven days later;

6. Rexford (age 16): multiple surgeries to address a lacerated liver, broken pelvis, broken rib, and knee injury;

7. Dillon (age 16): three surgeries for a broken femur, a broken pelvis, two broken bones in his arm, torn muscles in his back, and a puncture wound to his shin; required treatments to learn how to walk again;

8. Larsen (age 15): arrived at the hospital with no pulse and significant blood loss; 12 surgeries to repair two broken legs, a broken hip, and a broken pelvis; suffered a head injury;

9. Defendant (age 23): a lacerated spleen, a broken clavicle, chest contusions, a scalp laceration, a fractured tailbone, and a fractured pelvis.

¶ 13    At 3:09 a.m., a trauma panel was administered to defendant; it later revealed that defendant's blood alcohol content (BAC) was 0.124. At around 5:25 a.m., defendant consented to a blood draw, which showed her BAC to be 0.084. Using both samples, a State forensic toxicologist performed an extrapolation calculation to estimate that defendant's BAC at the time of the accident was between 0.114 and 0.144. Another State expert performed a similar extrapolation and estimated that defendant's BAC at the time of the accident was between 0.113 and 0.121. Defendant's expert estimated that defendant's BAC at the time of the accident was between 0.04 and 0.07, with one drink left to be absorbed (in other words, that her BAC did not peak until after the accident). He nevertheless agreed that the risk of a crash increases when one's BAC is 0.05 or higher.

¶ 14    Two accident reconstruction experts testified for the State that, before the collision, defendant's vehicle was traveling at least 68 miles per hour; the posted speed limit was 45 miles per hour. Defendant's expert testified that defendant's vehicle's "initial velocity" was 75 miles per hour. Further, a State expert testified that defendant's car struck the pole at 44 miles per hour; defendant's expert testified that defendant's car struck the pole at 58 miles

per hour.

¶ 15    At the time of trial, the surviving passengers could not recall the car ride or accident. The trial court admitted as substantive evidence a statement that Rexford gave to police, in her hospital room the morning after the crash, wherein she described defendant as "driving like an idiot," repeatedly veering to the left, driving very fast, and purposefully taking very sharp turns.

¶ 16    On June 30, 2010, after deliberating for 12 hours and asking the court several questions, the jury convicted defendant of all charges.

¶ 17                                B. Presentencing

¶ 18    While facing the charges (*i.e.*, for over three years, from the date of the incident through trial), defendant had been out on bond, without a single violation. After she was convicted, however, the court revoked the bond and defendant was taken into custody.

¶ 19    Prior to sentencing, defendant challenged the constitutionality of section 11-501(d)(2)(G) of the Code, which provides that, unless the court determines that "extraordinary circumstances" exist that require probation, a person convicted of an aggravated DUI that results in the death of multiple persons must be sentenced to a term of imprisonment of not less than 6 years and not more than 28 years. 625 ILCS 5/11-501(d)(2)(G) (West 2008).[2] Defendant argued that the section was unconstitutionally vague because the phrase "extraordinary circumstances" was not defined and did not provide sufficient notice to her such that she could properly prepare for her sentencing hearing. Defendant argued that she did not know whether "extraordinary circumstances" referred to those of her own life, or those of the incident for which she was convicted. The trial court, relying on the decision in *People v. Winningham*, 391 Ill. App. 3d 476, 484 (2009) (holding that the phrase "extraordinary circumstances" is not unconstitutionally vague), denied defendant's motion.

¶ 20                               C. Sentencing Hearing

¶ 21    The sentencing hearing took place on August 27, 2010. The record reflects that, on two occasions as witnesses testified, defendant appeared to become overwhelmed, seemed to have difficulty breathing, and looked as though she might faint; on the second occasion, defendant stated, "I'm sorry . . . . Oh God, I can't do this, I'm sorry. God, I'm so sorry." The proceedings recessed as defendant was escorted from the courtroom.

¶ 22                               1. Defendant's Evidence

¶ 23    On defendant's behalf, her mother, Monica, testified that defendant's children, Isaiah and

---

[2]Specifically, section 11-501(d)(2)(G) of the Code provides: "Aggravated driving under the influence of alcohol *** is a Class 2 felony, for which a defendant, *unless the court determines that extraordinary circumstances exist and require probation*, shall be sentenced to *** a term of imprisonment of not less than 6 years and not more than 28 years if the violation resulted in the deaths of 2 or more persons." (Emphasis added.) 625 ILCS 5/11-501(d)(2)(G) (West 2008).

Brooklynn (ages eight and four, respectively, at the time of sentencing) were currently under Vanessa's care. Vanessa quit her job and stopped going to school to care for defendant's children. Monica explained that, if defendant were incarcerated, she, Monica, would quit her job at Mutual Ground, where she worked as an advocate for victims of domestic violence, to care for the children because Vanessa was too young to do so permanently. Caring for the children would be a difficult task because Monica was diagnosed with rheumatoid arthritis, and her health would continue to deteriorate. Monica explained that Isaiah, whose father was in a federal penitentiary, asked for defendant every day and, each day, marked a calendar awaiting defendant's return. Brooklynn asked for defendant at night. Further, Monica explained that defendant, who had been working with Alzheimer's patients in a nursing home at the time of the accident, was caring for Monica's mother, who also suffered from Alzheimer's. Vanessa, who had no special training with regard to Alzheimer's patients, had temporarily assumed that role; but, if defendant were to be incarcerated and Monica were to quit her job to care for Isaiah and Brooklynn, the family might need to send Monica's mother to family members in Texas or Washington. Monica identified a scrapbook that contained letters and cards of support from family, strangers, and residents of Holmstad, the nursing home where defendant worked. Finally, Monica identified a glass prayer candle. Defendant had prepared the candle with pictures of the victims and, each night, she lit it and prayed to it. Monica testified that defendant had not been the same since the accident and that she felt as though she had lost part of her daughter. Monica apologized to the victims' families.

¶ 24     Erica, one of defendant's sisters, testified that defendant was an honest, loving, caring person, with "the biggest heart in this world," and that she would never intentionally harm another person. Erica testified that the prosecution and defendant's absence from her children had affected them enormously and that the children need her. Further, Erica explained that Isaiah had severe asthma and that, although the family tried to care for him, defendant was the only one who knew when an attack was coming on and could appropriately treat him. She testified that, on several occasions after the accident, defendant had attempted suicide, saying that it should have been she who had died rather than the minors. Erica apologized to the victims' families.

¶ 25     Similarly, Stella Diamond, defendant's aunt, testified to the effect the prosecution was having on Isaiah; namely, he was distant, and she felt that, without his mother, he was unlikely to reconnect with the world. Stella testified that defendant had a big heart and never intended for this to happen. Stella apologized to the victims' families.

¶ 26     Michael Miller, a priest and pastor at the Missionary of the Sacred Heart and St. Theresa's Church, testified that he met with defendant in the hospital on the night of the accident. He explained that defendant was truly repentant and remorseful and that she expressed pain not only for herself, but also for the minors and their families. Miller testified that defendant is a good person who means well, but made some bad decisions.

¶ 27     Bruce Waterman, a deacon at St. Theresa's Church, testified that he was defendant's religious educator and a minister to her family and that he knew defendant well. Waterman testified that he had counseling sessions with defendant since the accident and that defendant was very remorseful. He testified that he would be "right there" with defendant if she received probation and that, because he believed that her experience could be of great impact

to the community and, particularly, young people, he would choose defendant to help with educating young people at the church.

¶ 28    Jesus Vasquez, defendant's brother, testified that Isaiah was a completely different person, he was missing half of his heart, and he needed defendant.

¶ 29    A letter written by Isaiah, asking the court to send his mommy back because he loved and could not live without her, was read into the record.

¶ 30    Defense counsel submitted approximately 30 letters from persons in the community expressing support for defendant.

¶ 31    The presentence report reflected that defendant was diagnosed with post-traumatic stress disorder, night terrors, chronic back pain, and other physical ailments and was taking medication for those conditions.

¶ 32                              2. The State's Evidence

¶ 33    The State presented testimony from Officer Frank Tonkovich, a Naperville police officer, who testified that, in 2006, defendant was cited for retail theft, an ordinance violation, and fined. Defendant did not personally steal items, but a department store video showed her shopping with another person who used defendant's diaper bag to steal clothing. Defendant pleaded guilty to the violation.

¶ 34    The State entered into evidence various sentencing exhibits, including certified abstracts reflecting that defendant was involved in a Kane County traffic case for a failure to reduce speed to avoid an accident, a Cook County traffic case for speeding 26 to 30 miles per hour over the posted speed limit, and a Kane County traffic case for speeding 15 to 20 miles per hour over the posted speed limit.

¶ 35    The State also presented victim impact statements from: (1) Michael Nutoni (Jessica's father); (2) Ruthie Keefner (James McGee's aunt); (3) Arielle Rexford; (4) Robert Larsen (Robert Larsen, Jr.'s father), who read a statement his son had written; (5) Taylor Godfrey (Tiffany Urso's cousin); (6) Donna Dwyer (Matthew Frank's mother); and (7) John Merkel (Katie's father). We summarize those gut-wrenching statements as: recounting the horror of being notified of their loved ones' death and the subsequent body identification process; expressing their profound and agonizing sense of interminable loss; delineating the devastation that resulted, both emotional and financial, to the victims and/or the victims' families; and conveying varying emotions and opinions regarding an appropriate sentence for defendant. For example, Donna Dwyer reminded defendant that, no matter what sentence she received, she, unlike the victims' families, would be able to see her children again and that, therefore, defendant was not the victim. John Merkel expressed that his family is serving a life sentence with no visitation and that, if he could serve 28 years and see his daughter again, he would do it "standing up." However, Robert Larsen, Jr., expressed that many mistakes were made on the night of the accident and that he felt bad that the court might take defendant away from her family.

¶ 36                    3. Defendant's Statement in Allocution

¶ 37     Defendant apologized to the court for its having to hear this very difficult case. Defendant next addressed the three assistant State's Attorneys who prosecuted the case and apologized for everything they were put through, the time it took away from their families, and their having to go through what the families experienced, and she said: "I also would like to thank you for representing the families, and if that was me sitting there, I would want somebody like you to represent my family members, too. Thank you."

¶ 38     To the victims' families, defendant explained that, for more than three years, she had tried to think of how she could tell them how sorry she was. She would go through it in her head or would write it down and rip up the pages because the words were never right. Defendant expressed that she had repeatedly asked God to "take her," because it was too hard for her to deal with what the families were going through. Defendant explained that she mourned with them: "God. God as my witness, I never wanted this to happen ever, and if the price of my life being behind bars would help any of you guys get through this, I promise God as my witness I'm willing to do whatever."

¶ 39     Defendant apologized to her family for the pain they had experienced, particularly when she no longer wished to live and for more than three "empty" years from her. "I love you guys. Take care of my babies."

¶ 40     The State requested a 24-year sentence of imprisonment. The defense requested probation.


¶ 41                                    4. The Sentence

¶ 42     The trial court announced that it had considered all evidence in aggravation and mitigation. In mitigation, the court found that: (1) defendant did not contemplate that her conduct would cause or threaten serious physical harm; (2) defendant's conduct resulted from circumstances unlikely to recur; (3) defendant's character and attitude indicate that she is unlikely to commit another crime; (4) defendant is particularly likely to comply with a period of probation; and (5) a period of imprisonment would entail hardship on her two children. With respect to hardship on the children, the trial judge emphasized that, as a father and as a human being, he understood that, whenever a mother is taken away from her children, whether for one day or the rest of her life, it constitutes a hardship that he took into consideration. Further, the court stated that it considered in mitigation the many letters submitted on defendant's behalf, which reflected that defendant is a person of good character who is loved and cared for, as well as the prayer candle and defendant's actions in praying for the victims' families.

¶ 43     In aggravation, the court found that: (1) defendant had a history of criminal activity in that she had speeding tickets and, while the court stated that it did not weigh the traffic violations as seriously as it would a misdemeanor or felony offense, it found them relevant given the offenses charged; (2) the sentence must deter others from committing the same crime; and (3) defendant committed the offenses while operating her vehicle in excess of 20 miles per hour over the speed limit.

¶ 44     The court noted that the parties had opposing views on whether "extraordinary

circumstances" warranting probation were present here, and it summarized each side's arguments with respect thereto. Noting that no case defines "extraordinary circumstances," the court stated that it had considered all factors and arguments made by both sides. The court concluded that there were no extraordinary circumstances warranting probation and, further, that a sentence of probation would deprecate the seriousness of the offenses and would be inconsistent with the ends of justice.

¶ 45 The court stated that it had "no doubt," after watching defendant throughout the trial and sentencing, that defendant's remorse was genuine and that she did not intend for the accident to happen. It further found that, prior to the accident, defendant led a relatively law-abiding life, graduated from high school, obtained and maintained a job, became "by all accounts" an excellent mother who loves and cares for her two children, and was a good daughter, sister, and family member. The court found that, upon defendant's release from prison, she will most likely be a productive member of society and will have continued family support. Thus, it found inappropriate a sentence near the top of the 6- to 28-year sentencing range.

¶ 46 However, the court found that a sentence near the minimum end of the range would also be inappropriate. Although lengthy, we provide a full recitation of the court's reasoning:

> "I believe that you are not a bad person. I believe that the jury made a finding that you made a bad decision and that decision has resulted in us being here.
>
> When considering the seriousness of the offense and the manner in which it was committed, I do find the following: One, you were traveling at least 20 miles over the posted speed limit. A minimum of 65 to upwards of 75 miles per hour in a 45 mile per hour zone. I consider that very serious. At the time that you were traveling at that rate of speed, you indicated in your testimony that you knew one of your headlights was out and that you were driving at this speed at between one and two in the morning knowing that you only had one headlamp. Also[,] when considering the manner in which you committed this, you committed both of those, you drove at that speed with only one headlight while you were over the legal limit, and I find that it was proven beyond a reasonable doubt that you had a blood alcohol content of over .08. In doing all the above, you did so driving a total of nine people including yourself in a car designed for five. You allowed six people to be in your back seat, two people in the front seat, and yourself.
>
> * * *
>
> Now, it's true that all the passengers in that car with the exception of one had either been drinking or smoking marijuana on the night in question. It's also true that they found themselves that night without a ride home or any place to stay after drinking or smoking throughout the night. They were stuck outside the house. They had no place to go. I know that's a fact that everyone in this courtroom, you, all of you, wish that we could change. Unfortunately, we can't. You had a car. You volunteered to give Josh Dillon a ride home and somehow, although not entirely clear to this court, eight people ended up in your car. They either jumped in your car or you allowed them to get into your car, but in the end, you were in that driveway with the keys and you had nine people in your car. You were supposed to take your sister home. Your sister didn't go with you. You were supposed to take your best friend[, *i.e.*, Anna, home]. She wasn't with you. But

I think what's important to this court as it relates to the nature of the offense is that you had a choice to make at that time.

You could have refused to drive them away. You could have refused to drive them until a certain number got out of the car. You could have made them all get out and just driven your sister and your best friend home. And you did none of the above. You made a conscious decision that night to drive away with eight people in your car, and as the driver of that car, you were responsible for not only your safety but the safety of your passengers and for everybody else on that road.

I also think that it's important and I do consider the fact that on the night in question you made a conscious decision to drink. I understand that night that you had put your baby down and that it was your intention to go to bed. I understand and agree with [defense counsel] that there has been a series of circumstances here that if any one had just not happened, we wouldn't be here today, but the reality is that they did happen. But when you went out that night, you made a decision to drink and you drank enough alcohol to be over the legal limit. You drank enough alcohol to be impaired. And you did so knowing that you were going to be driving yourself home that night, your sister home that night, or your best friend home that night. So, regardless of whether Josh Dillon ever asked you for a ride, regardless of how those other kids got into your car, you were driving under the influence of alcohol that night. And again, with eight people at 20 miles over the speed limit with the headlight out, as a result of that, you are here today."

¶ 47     The court sentenced defendant to 15 years' imprisonment for aggravated DUI. The court imposed four-year sentences on the five reckless homicide charges, to run concurrently with each other and the aggravated DUI sentence.

¶ 48                                    D. Postsentencing

¶ 49     On October 29, 2010, the trial court denied defendant's amended motion to reconsider the sentence, again disagreeing with defendant that extraordinary circumstances required probation. Defendant's counsel noted that, even if the court did not find probation appropriate, "why not six years [the minimum sentence of incarceration]? Why 15 years at 85 percent? It's taken her away from her children that will be adults essentially by the time she's released on parole." Defendant asked the court to reconsider the mitigating factors. The court stated to defendant, "I understand that the sentence takes you away from your kids. I think about that very much. I did that at the time of sentencing. But I believe that for the reasons that I have [*sic*] stated at the time of the sentencing that it is an appropriate sentence." Defendant appeals.

¶ 50                                    II. ANALYSIS

¶ 51                              A. Statute is Constitutional

¶ 52     Defendant argues first that section 11-501(d)(2)(G)'s (625 ILCS 5/11-501(d)(2)(G) (West 2008)) provision that permits probation only in "extraordinary circumstances" is unconstitutionally vague because it does not provide a clear standard for application by the

sentencing court. Again, section 11-501(d)(2)(G) provides that, where an aggravated DUI results in the death of multiple persons, a sentence of imprisonment shall be imposed "unless the court determines that extraordinary circumstances exist and require probation." 625 ILCS 5/11-501(d)(2)(G) (West 2008). Defendant notes that the statute does not define what satisfies the "extraordinary circumstances" standard (*e.g.*, does it refer to circumstances of the offense, or circumstances of the defendant's life and character) and thereby encourages arbitrary imposition of sentences. If extraordinary circumstances may include a defendant's life and character, then, defendant asserts, the statute provides no notice or guidance regarding what a defendant must present to the sentencing court and what standard of proof must be satisfied to warrant probation.

¶ 53 This court must presume that all statutes are constitutional; it is the burden of the party challenging the validity of a statute to demonstrate a constitutional violation. *People v. Waid*, 221 Ill. 2d 464, 480 (2006); *People v. Greco*, 204 Ill. 2d 400, 406 (2003). If reasonably possible, we must construe a statute so as to affirm its validity and constitutionality. *Greco*, 204 Ill. 2d at 406. We review *de novo* a challenge to the constitutionality of a statute. *In re Lakisha M.*, 227 Ill. 2d 259, 263 (2008).

¶ 54 Defendant argues that the statute is unconstitutionally vague and is subject to arbitrary and discriminatory application.[3] A statute will not be deemed void for vagueness if it is "explicit enough to serve as a guide to those who must comply with it." *General Motors Corp. v. State of Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 24 (2007). Due process requires that a statute be sufficiently clear so that persons of common intelligence are not required to guess at its meaning or application. *People v. Ramos*, 316 Ill. App. 3d 18, 26 (2000). A sentencing statute does not satisfy due process "if its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than objective criteria." *General Motors*, 224 Ill. 2d at 24. However, due process does not require mathematical certainty and will be satisfied if "(1) the statute's prohibitions are sufficiently definite, when measured by common understanding and practices, to give a person of ordinary intelligence fair warning as to what conduct is prohibited; and (2) the statute marks boundaries sufficiently distinct for judges and juries to administer the law fairly in accordance with the intent of the legislature." *Ramos*, 316 Ill. App. 3d at 26.

¶ 55 We start our analysis with *Winningham*, the Fourth District Appellate Court decision upon which the trial court relied in rejecting defendant's constitutional challenge. In *Winningham*, the defendant was involved in a motor vehicle collision that killed one person and severely injured others. The defendant was charged with and subsequently pleaded guilty to aggravated DUI. At the sentencing hearing, the defendant presented evidence that: (1) he

---

[3]Defendant does not clearly argue that the statute is vague on its face but, to the extent she makes such an argument, it fails. Defendant acknowledges that the statute does not affect first-amendment rights; thus, it will not be declared unconstitutionally vague on its face unless it is incapable of any valid application, "that is, unless under no set of circumstances would the statute be valid." *Winningham*, 391 Ill. App. 3d at 481. By arguing that the term "extraordinary circumstances" is subject to arbitrary application, defendant concedes that the statute can be validly applied in some, albeit not all, situations. *Id*.

did not have a criminal record; (2) he was employed as a lieutenant in a fire department; (3) as a firefighter, he had saved numerous lives; (4) he had completed over 50 hours of alcohol counseling; and (5) he had continually expressed sincere remorse and regret for his actions and the resultant death and injuries. The trial court admitted into evidence approximately 80 to 90 letters from the defendant's family, friends, and other firefighters describing the defendant's positive impact on their lives. Further, the court entered into evidence a letter from counsel for the deceased victim's estate, which showed the defendant's willingness to assist counsel's pursuit of a dramshop suit against the tavern where the defendant had been drinking. The defendant requested a sentence of probation on the basis of "extraordinary circumstances," but the court imposed a three-year sentence of incarceration (the minimum period of incarceration for an aggravated DUI resulting in one death).

¶ 56    The defendant appealed, claiming that section 11-501(d)(2) (in its formerly numbered state, but with identical "extraordinary circumstances" language) was unconstitutionally vague, because the "extraordinary circumstances" provision was subject to arbitrary and discriminatory enforcement. The Fourth District Appellate Court disagreed, holding that, even though "extraordinary circumstances" is not defined, the statute nevertheless provides sufficient, definite standards for a trial court to fairly administer it. *Winningham*, 391 Ill. App. 3d at 483. The court noted that the section generally requires the trial court to impose a sentence of incarceration when an aggravated DUI results in the death of another person; however:

"[i]n so mandating, the legislature also recognized that rare instances may exist in which a sentence of probation may be appropriate, given the unique circumstances of a particular case. Thus, as a matter of legislative grace and lenity, the General Assembly determined that it would not entirely eliminate the trial court's discretion to impose a sentence of probation. However, the General Assembly also determined that a court may do so only under extraordinary circumstances, which is entirely consistent with the great danger that drunk drivers impose upon our society, as shown by the tragic circumstances of this very case. Thus, the challenged provision's clear purpose was to substantially limit the discretion that a trial court possesses to impose a sentence of probation when a defendant's DUI offense proximately caused the death of another person." *Id.*

¶ 57    Further, the court held that the legislature's decision not to specifically define the exact circumstances that constitute "extraordinary" ones, but, rather, to leave that determination to the trial court's discretion, does not render the statute unconstitutionally vague. *Id.* Citing several supreme court opinions, the *Winningham* court noted that vagueness arguments regarding similar sentencing provisions have been consistently rejected. *Id.* at 483-84.

¶ 58    Recently, the Fifth District Appellate Court agreed with *Winningham*'s conclusion and upheld the constitutionality of section 11-501(d)(2)(G)'s "extraordinary circumstances" provision. *People v. Hill*, 2012 IL App (5th) 100536, ¶ 23. Defendant acknowledges the *Winningham* and *Hill* holdings, but notes that this court has not weighed in on the issue. We do so now. We agree with the *Winningham* and *Hill* decisions and hold, for three reasons, that section 11-501(d)(2)(G) is not unconstitutionally vague.

¶ 59    First, the phrase "extraordinary circumstances" is capable of being understood by its plain

and ordinary meaning. See *People v. Boclair*, 202 Ill. 2d 89, 106 (2002). Extraordinary circumstances are, quite simply, those that are not ordinary. They are unusual. Our commonsense understanding is supported by Black's Law Dictionary, which defines "extraordinary circumstances" as "a highly unusual set of facts that are not commonly associated with a particular thing or event." Black's Law Dictionary 260 (8th ed. 2004). Therefore, even though the statute does not define "extraordinary circumstances," the phrase is sufficiently clear so that persons of common intelligence are not required to guess at its meaning. See *Ramos*, 316 Ill. App. 3d at 26.

¶ 60　　　Second, the statute provides sufficient guidance such that reasonable defendants and sentencing judges are not without objective criteria for its application. Defendant's argument that there is insufficient guidance for application stems from the fact that the phrase is not limited or restricted to any particular aspect of a case. Her primary contention is that it is not clear whether the statute requires a court to consider "exceptional circumstances" in the defendant's life, the nature of the offense, or something else entirely.[4] Defendant suggests that, without clear parameters reflecting to which circumstances the phrase should be applied, the result is "chaos," defendants do not know what evidence to present at sentencing, and courts will arbitrarily administer the provision. We disagree.

¶ 61　　　The statute requires incarceration unless the court determines that "extraordinary circumstances exist and require probation." 625 ILCS 5/11-501(d)(2)(G) (West 2008). Thus, the statute requires both extraordinary circumstances *and* that those circumstances require probation. Therefore, as used in the statute, "extraordinary circumstances" contemplates those that are mitigating, *i.e.*, those that weigh in favor of probation over incarceration. See, *e.g.*, Black's Law Dictionary 260 (8th ed. 2004) (defining "mitigating circumstances" as facts or situations that may reduce punishment). In that vein, sentencing courts and parties already have guidance on what circumstances may be relevant. To start, mitigating factors are defined in section 5-5-3.1 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1 (West 2006)). A defendant and a sentencing judge may look to those defined mitigating factors and assess whether, in the case at hand, the evidence of those factors (1) is extraordinary, *i.e.*, highly unusual for the situation; and (2) requires probation. 625 ILCS 5/11-501(d)(2)(G) (West 2008). Therefore, at a minimum, there already exists a framework to which defendants and courts may refer when considering which circumstances might be so extraordinary that they mitigate against a sentence of incarceration.

¶ 62　　　This is not to say that courts may consider *only* extraordinary versions of the mitigating factors explicitly listed in section 5-5-3.1 of the Unified Code of Corrections. Indeed, not only is that list in and of itself not limiting, section 11-501(d)(2)(G) refers only generally to "extraordinary circumstances" that require probation. Therefore, the statute does not in any way constrain the court from considering, in its discretion, *any* relevant "extraordinary circumstance." We disagree with defendant that the result is chaos and arbitrary application.

---

[4]While "exceptional circumstances" indeed might include something other than the defendant's life or the offense, we note that the scope is necessarily limited by the fact that the circumstances must, of course, be *relevant* to the question of the defendant's sentence.

Where there exists sufficient guidance for the fact finder to know how to apply a provision, application of the provision is not rendered unconstitutionally arbitrary. We note, as did the *Winningham* and *Hill* courts, that our supreme court has rejected constitutionality arguments that similar terms in sentencing statutes, such as "exceptionally brutal or heinous" and "cold, calculated and premeditated," are so broad and subjective that they lead to arbitrary application. See, *e.g.*, *People v. McLaurin*, 184 Ill. 2d 58, 99 (1998) ("cold and calculated" provides sufficient guidelines for application); *People v. Lucas*, 132 Ill. 2d 399, 443-44 (1989) (" 'exceptionally brutal or heinous' " not so subjective that trier of fact is left without proper guidance and application is necessarily unreasoned and capricious). Indeed, we agree with the State that, as trial courts "commonly determine sentences within statutorily defined ranges in the sound exercise of their discretion" (*People v. Hickman*, 163 Ill. 2d 250, 258 (1994)), section 11-501(d)(2)(G)'s grant of discretionary authority to the trial court to determine if "extraordinary circumstances" in a given case require probation is no different from the trial court's primary responsibility to fashion an appropriate sentence based upon ordinary circumstances.

¶ 63    Further, we question why a defendant would *want* this court to specifically define "extraordinary circumstances" as pertaining to specific subsets of circumstances, *i.e.*, only the circumstances of the offense or the defendant's life and character. As it stands, the General Assembly, "as a matter of legislative grace and lenity" (*Winningham*, 391 Ill. App. 3d at 483), left unconstrained a trial court's discretion to consider *any* extraordinary circumstances that might warrant probation. As the *State* is unlikely to argue that, based on extraordinary circumstances, probation is appropriate, it benefits *defendants* that there is no limitation on the phrase. As it stands, the defendant may present evidence of *any* relevant extraordinary circumstances, whether it be extraordinary circumstances surrounding the offense, his or her life, or the combination of both. It is then for the court to decide whether that evidence establishes circumstances so extraordinary that probation is required. In sum, section 11-501(d)(2)(G) is not so vague that persons of common intelligence are required to guess at its application. See *Ramos*, 316 Ill. App. 3d at 26.

¶ 64    Having concluded that the statute's meaning and application are capable of being understood by persons of ordinary intelligence, we reach our third reason for rejecting defendant's constitutionality argument: the legislative objective behind section 11-501(d)(2)(G) sufficiently guides the section's application. See *Greco*, 204 Ill. 2d at 416 (when considering a vagueness argument, we are to consider not only, as above, the statutory language, but also the "legislative objective and the evil the statute is designed to remedy"). Indeed, when section 11-501(d)(2)(G) is viewed in context, the legislative objective is clear. Generally, the Unified Code of Corrections creates a presumption in favor of probation. 730 ILCS 5/5-6-1(a) (West 2006). However, it also makes nonprobationable specific offenses, for example, residential burglary (720 ILCS 5/19-3 (West 2006)). 730 ILCS 5/5-5-3(c)(2)(G) (West 2006). The statute at issue here, section 11-501(d), falls into neither of the aforementioned classes: it neither presumes probation, nor specifically prohibits it. Rather, under section 11-501(d)(2)(G), there is a *presumption of incarceration* that may, in the trial court's discretion, be overridden; it may not, however, be overridden lightly. The legislature specified in section 11-501(d)(2)(G) that, where a defendant's commission of aggravated

DUI proximately caused a fatal accident, a court may override the presumption of incarceration only where it determines, in its discretion, that extraordinary circumstances require probation. See *People v. Maldonado*, 386 Ill. App. 3d 964, 978 (2008) (explaining that the legislative objective behind the "extraordinary circumstances" language was "to limit the discretion of a trial court to impose probation"). As such, the statute provides sufficient guidance for application: courts may override the statute's presumption of incarceration only in extraordinary circumstances.[5]

¶ 65    In sum, defendant has not carried her burden of rebutting the presumption that section 11-501(d)(2)(G) of the Code is constitutional. We agree with the conclusions in *Winningham* and *Hill* and hold that section 11-501(d)(2)(G) is not unconstitutionally vague.


¶ 66                    B. Sentence Is Not an Abuse of Discretion

¶ 67    Defendant argues next that the trial court abused its discretion in sentencing her for aggravated DUI where it: (1) found no extraordinary circumstances required probation; and (2) imposed a sentence of 15 years' imprisonment. She asks this court to vacate her sentence and either reduce it or remand for a new sentencing hearing.

¶ 68    Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) gives a reviewing court the power to reduce a sentence; however, that power should be used carefully and sparingly. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We may not alter a sentence unless the trial court abused its discretion, *i.e.*, the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). A trial court's sentencing decision is entitled to great deference, and we may not substitute our judgment for the trial court's merely because we might have weighed the sentencing factors differently. *Id.* Where the sentence is within the statutory limits, we may not disturb it absent an abuse of discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). Here, we cannot conclude that the trial court's sentence constitutes an abuse of discretion.

¶ 69    We first note, as did the trial court, that the record reflects that defendant is not a bad person but, rather, that she made poor decisions with tragic results. Defendant presented significant mitigating evidence, including that: (1) she was only age 23 at the time of the

_____

[5]We note that defendant argues, based upon the legislative debates for this statute, that section 11-501(d)(2)(G) places upon defendants a "burden" to establish extraordinary circumstances, with no explanation as to what standard of proof applies to that burden. We believe that defendant misconstrues the legislative comments. Although multiple comments were made referencing a defendant's "burden of proof" to "beg" for probation, the comments essentially recognized that, after the amendment, the party who would argue that the presumptive sentence, *i.e.*, incarceration, should *not* apply would be a defendant. 94th Ill. Gen. Assem., Senate Proceedings, Apr. 15, 2005, at 27 (statements of Senator Dillard). Specifically, the amendment altered sentencing for aggravated DUI that results in death such that probation became the exception, rather than the presumptive sentence. The statute itself, however, places no burden on defendants; rather, it leaves to the court's discretion the determination of whether "extraordinary circumstances exist and require probation."

accident; (2) with the exception of traffic tickets, she did not have any meaningful criminal history; (3) while out on bond for more than 500 days, she did not commit any violations; (4) she trained as a nurse assistant and was gainfully employed to care for Alzheimer's patients, and cared for her grandmother; (5) her two young children were profoundly affected by her absence; (6) she suffered from health problems and required prescription medication for post-traumatic stress disorder, depression, night terrors, anxiety, chronic back pain, and physical ailments resulting from the accident; (7) representatives from defendant's church attested to her remorse and their willingness to help her; (8) via letters, she received support from family, friends, members of the community, and even strangers; and (9) she had genuine and consistent remorse.

¶ 70    We cannot conclude that the trial court abused its discretion in finding that the foregoing circumstances were not "extraordinary" and did not require probation. Again, the question is not whether the aforementioned circumstances are mitigating; indeed, they are mitigating and the trial court considered them as such. The question, rather, is whether the circumstances are "extraordinary," *i.e.*, not ordinary, "highly unusual," and "not commonly associated with a particular thing or event." Black's Law Dictionary 260 (8th ed. 2004). We do not find unreasonable the trial court's finding that: (1) defendant's good intentions, but poor judgment; (2) her sincere and profound remorse; and (3) the hardship that her incarceration will have on her family are *not* highly unusual in the case of any aggravated DUI that results in the death of others. We do not think it highly unusual that one who drinks before driving has no intention of killing anyone but, rather, believes at the time that he or she has reasons justifying the decision to drive. We do not think it highly unusual that such a driver might be a good person who made a bad decision and would experience profound remorse for the results of his or her actions. We do not think it highly unusual that a person's imprisonment will seriously and profoundly impact his or her dependents and loved ones. Nor do we think it highly unusual that a person whose aggravated DUI resulted in an accident that killed another might, him or herself, have physical injuries and psychological trauma from the ordeal. Indeed, the defendant in *Winningham* similarly led a crime-free life before his accident, served as a firefighter and saved many lives, expressed genuine remorse, and presented almost 100 letters of support. Here, the trial court did not abuse its discretion where it concluded that defendant's circumstances, many of which were present in the *Winningham* case, were not highly unusual or extraordinary.

¶ 71    As to the sentence imposed, it is clearly within the statutory range and is not an abuse of discretion. We recounted above the trial court's rationale in weighing the statutory mitigating and aggravating factors and fashioning the sentence that it did. The court concluded that the many mitigating factors made inappropriate a maximum sentence or even a sentence near the maximum end of the sentencing range. However, the court considered that, despite defendant's nonmalevolent intentions that night, she made conscious decisions to drink and drive, to greatly exceed the speed limit, and to drive her vehicle with far more people inside than appropriate. The court found that a sentence of probation or near the minimum of the sentencing range would, for those reasons, deprecate the seriousness of the offense and be inconsistent with the ends of justice. We agree.

¶ 72    It bears noting that, although the legal process involves many actors playing different

-16-

roles, each is human. It is clear to this court that the trial judge wrestled with the sentencing decision. This was apparent at both the time of sentencing and postsentencing, where the judge acknowledged that he thought "very much" about how the sentence would affect defendant's children and that she will miss most of their childhoods. This court, similarly, is not unaffected by the many tragic elements before us. However, while this case has to some degree impacted each person it has touched, the fact remains that the five deceased victims and their families have paid the greatest price. As the trial court noted at sentencing, there are *many* alternative decisions that could have been made on the night of the accident but, sadly, were not. The trial court's decision is simply not an abuse of discretion and must be affirmed.

¶ 73                                    III. CONCLUSION

¶ 74        For the foregoing reasons, the judgment of the circuit court of Kendall County is affirmed.

¶ 75        Affirmed.