2015 IL App (2d) 120444
No. 2-12-0444
Opinion filed March 31, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-3323 |
| JUSTIN CAVAZOS, | ) ) | Honorable Timothy Q. Sheldon, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     On January 20, 2007, 15-year-old Oscar Rodriguez and his girlfriend, Claudia Lozano, were walking along High Street near Grove Street in Aurora. Gunshots were fired from a passing sport utility vehicle (SUV), killing Rodriguez and injuring Lozano. Defendant, Justin Cavazos (age 16 when the shooting occurred), and his brother, Joshua Cavazos (age 17 when the shooting occurred), were charged in connection with the incident.

¶ 2     In 2011, the brothers were tried simultaneously (in adult court) by separate juries. Justin's jury convicted him of two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)), attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2006)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and

aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)).[1]  Further, as to the first-degree-murder and attempted-murder convictions, the jury found that Justin, or one for whose conduct he was responsible, committed the crimes while armed with a firearm, thus subjecting him to mandatory sentencing enhancements (730 ILCS 5/5-8-1(a)(1)(d) (West 2006)). The trial court denied Justin's posttrial motion and sentenced him to an aggregate of 60 years' imprisonment.

¶ 3    On appeal, Justin argues that he was denied a fair trial where the State introduced evidence: (1) of a subsequent bad act, which evidence he argues was relevant only for propensity purposes; and (2) from a gang expert, which he argues was purely cumulative and served only to characterize him as a bad person.  In addition, through supplemental briefing, Justin argues that Illinois law is unconstitutional where, together, the provisions for the mandatory transfer of juveniles to adult court (705 ILCS 405/5-130 (West 2006)), the application to juveniles of mandatory firearm enhancements (see 730 ILCS 5/5-8-1(a)(1)(d) (West 2006)), mandatory consecutive sentencing (see 730 ILCS 5/5-8-4(d) (West 2006)), and "truth in sentencing" (730 ILCS 5/3-6-3(a)(2)(i), (ii) (West 2006) (requiring that Justin serve 100% of the murder sentence and 85% of the attempted-murder sentence)) do not permit consideration of youthfulness at the time of the offense.  For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    In its opening statement, the State argued that Justin's motive for the shooting of Rodriguez and Lozano was to "hunt" and hurt rival gang members and that the evidence for that motive was supported by what Justin did later that same night.  Specifically, the State argued,

---

[1] Joshua, who was also convicted, appeals in *People v. Cavazos*, 2015 IL App (2d) 120171.

after the shooting, Justin got into another car with Insane Deuces gang members, found an alleged rival gang member, and, at the urging of his fellow passengers, got out of the car and fired shots at someone.

"And what does that show? That shows his motive, his intent. That as an Insane Deuce street gang member, what he does is he goes out and he looks for rival gang members and he looks to hurt them. And you can use that when evaluating this defendant's intentions when he was in the car with his brother and two other *** gang members, just before Oscar Rodriguez was shot."

¶ 6                        A. State's Case-In-Chief

¶ 7    Lozano testified that, on January 20, 2007, she and Rodriguez were in the ninth grade. At around 2 p.m., they were walking down the sidewalk on High Street in Aurora. Rodriguez was closer to the street. Lozano testified that she is nearsighted, which affects her ability to clearly see things at a distance, and was not wearing her glasses that day. A dark, navy blue, four-door SUV drove by, with the driver's side of the SUV closer to the sidewalk. According to Lozano, the passengers on the driver's side started "throwing" gang signs and yelling gang slogans at Lozano and Rodriguez. Lozano testified that, initially, the passengers were throwing signs associated with the Insane Deuces street gang and were saying something similar to, "Deuce love" and "[Latin] King killer." She did not recall anyone in the SUV yelling anything indicating a loyalty to the Latin Kings street gang. Rodriguez responded, "King love." Rodriguez might have known members of the Latin Kings, and his brothers used to wear Latin King colors, but Lozano did not know if they were gang members.

¶ 8    The SUV passed Rodriguez and Lozano, but it did a quick U-turn and, when it returned, the SUV's passenger side was closer to the sidewalk. Lozano heard four or five gunshots come

from the SUV. She and Rodriguez fell to the ground. Lozano was hit by a bullet on her left thigh. She stood up, looked at Rodriguez, and saw that he had been shot and his head was bleeding. Rodriguez could not stand up or talk and (as testified to by the medical examiner) died from multiple gunshot wounds. The SUV drove south and made a left turn onto Grove Street.

¶ 9    Lozano testified that she could not identify the people who were inside the SUV, because they were all wearing "hoodies" and her vision was blurry. She did, however, observe that there were two people in the front seat, and she knew that there was at least one person in the backseat, because, when the SUV returned, someone was hanging out of the backseat passenger-side window. Lozano recalled that this person had the gun. Lozano told police that she thought that the men in the SUV (she did not hear any female voices shouting from the SUV) were Hispanic, that the driver had a beard or goatee, and that he appeared to be around 17 years old.

¶ 10    Felipe Rojo testified that, for 18 years, he had lived near the intersection of High and Grove Streets in Aurora and he could see the intersection from his house. Around 2 p.m. on January 20, 2007, Rojo was inside his house when he heard a sound "kind of like some gunshots." Rojo went to the front window and saw a car, similar to a Ford Explorer or Chevrolet TrailBlazer, drive up High Street and turn east onto Grove Street. The SUV was driving "almost as if it had been sliding, very fast." Rojo could not recall the SUV's color, but he remembered that it had a yellow permit on its rear license plate.

¶ 11    Officer Ted Hunt responded to the scene. Dispatch informed him that the suspect vehicle, a black Chevrolet TrailBlazer with a temporary license plate, was last seen going east near Grove Street and High Street. Hunt proceeded in that direction and located, parked along the curb at 1223 Grove Street, *i.e.*, seven blocks from the scene of the shooting, a black

Chevrolet TrailBlazer with a yellow temporary license plate. Hunt ran the vehicle's information through his computer system and learned that it was stolen.

¶ 12    Jorge Briesca testified that the recovered SUV was his and that he had reported it stolen. When the SUV was processed for DNA, gunshot residue, and fingerprints, one of the items tested was a cigar found in the cup holder on the front passenger-side of the vehicle. Briesca testified that the cigar was not his, nor was the cigar in his SUV when it was stolen.

¶ 13    Katharine Mayland, a forensic scientist and latent fingerprint examiner, testified that Joshua's fingerprint was found on the cigar's clear plastic cellophane wrapper.

¶ 14    Four shell casings were found at the scene. Jeff Parise, a forensic scientist specializing in the fields of firearms and firearms identification, studied the casings and opined that they were fired from the same .40-caliber automatic or semiautomatic firearm.

¶ 15                          1. Gang Member Testimony

¶ 16    David Hernandez testified that he previously lived in Aurora. Hernandez joined the Insane Deuces when he was 15 years old, because he was "bored." In 2007, both Justin and Joshua were members of that gang, as was Jaime Barragan (and Ignacio Rios, Trino Osorio, Eddie Montanez, and Wesley Grant). The gang members would often stay at Manny Caranza's apartment in Aurora. Caranza, also an Insane Deuces member, kept firearms, including .40-caliber weapons, in his apartment. The guns, known as "nation guns," belonged to the gang and were available for any gang member to use when "hunting" (*i.e.*, looking for rival gang members to shoot). At the time of the shooting, the Insane Deuces and the Latin Kings were rivals, and the area of High and Grove Streets in Aurora was known Latin King territory. Generally, "hunting" would be the only purpose for Insane Deuce members to enter that area.

¶ 17    On January 19, 2007, Hernandez, Barragan, and both Cavazos brothers were at Caranza's apartment.    Late in the evening, Hernandez and Barragan left the apartment to steal a car.    While Hernandez stood as lookout, Barragan stole a black TrailBlazer SUV.    The license plate had a "Dempsey" dealership decal.    They drove the SUV back to Caranza's apartment and stayed the night.

¶ 18    The next morning, January 20, 2007, Hernandez and Barragan told the Cavazos brothers about the SUV, and then they "hung out," playing video games and talking.    At some point, Justin, Joshua, and Barragan, who had been having a conversation in the kitchen, entered the living room and told Hernandez to come with them.    The four men got into the SUV:    (1) Barragan drove; (2) Joshua sat in the front passenger seat; (3) Hernandez sat in the rear passenger-side seat; and (4) Justin sat in the rear driver's-side seat.    They drove around, ate McDonald's food, and then went "hunting" in Latin King territory.    On High Street, they saw a "rival gang banger" walking with someone else.    When asked if the "gang banger" was a "he" or a "she," Hernandez replied, "he."    When asked how he knew that "he" was a rival gang member, Hernandez explained that he was wearing Latin King colors.    Further, when the driver's side of the SUV was closer to the sidewalk, someone in the SUV "threw up" the Latin King crown signal.    The male pedestrian, who was closer to the street, threw the crown back, "so that notified him as a Latin King."

¶ 19    The SUV drove past the pedestrians, then turned around and came back toward "him."    The passenger side of the SUV was now closer to the sidewalk.    At that time, Justin handed Hernandez a .40-caliber semiautomatic handgun.    Hernandez looked at the gun, held it for a second, and refused to pull the trigger.    He passed the gun back to Justin.    Justin then passed the gun up front to Joshua.    Joshua aimed the firearm out the window and shot three or four rounds.

Hernandez looked out the window and saw the male lying on the ground. Hernandez did not remember if, at that time, he was hanging out of the SUV's back window. Barragan sped off and turned left. A few blocks later, they "ditched" the car. They were wearing gloves while in the car and did not wipe it down before running away. The four men split up; Barragan and Justin ran off together, and Hernandez and Joshua ran through some fields until they arrived at a flea market. They used the bathroom and then called Caranza for a ride. While they were waiting, they hid the gun under some leaves and branches by Cowart Middle School.

¶ 20    Caranza picked up Hernandez and Joshua and they returned to his apartment. Eventually, Joshua and Barragan returned too. At that time, Caranza, Joshua, Justin, and Barragan had a conversation in the spare bedroom. Hernandez was not included in that discussion; he was treated like a "coward" because he did not pull the trigger. As a result of the shooting, Joshua had a tattoo of a spade placed on his back. Hernandez explained that the spade is a symbol of the Insane Deuces.

¶ 21    Hernandez stated that he was not testifying by choice but rather, was doing so pursuant to a deal he made with the State. Specifically, Hernandez testified that, in exchange for his testimony, he was accepting a five-year sentence for possession of a stolen motor vehicle (but was hopeful that the court would instead impose five or six months in "boot camp"). He was not charged with murder in connection with this case, but he was charged with possession of a handgun and 12 misdemeanors. Pursuant to the agreement, he was pleading guilty to the possession charge, and the 12 misdemeanor charges were to be dropped. Hernandez agreed that when, on October 27, 2007, he gave a statement to police, he was reluctant to talk without a deal. He was "begging" for a deal, because he had violated probation and was told that he would be charged with murder. Nevertheless, at the time of his statement and without any offer of a deal,

Hernandez identified Barragan, Joshua, and Justin in photographic lineups. As part of the deal he did eventually receive, he was required to testify truthfully in court. The State asked Hernandez what would happen if he did not testify truthfully, and he responded, "I get charged for first-degree murder."

¶ 22 On cross-examination, defense counsel reviewed with Hernandez his four-page agreement with the State. Hernandez agreed that the deal required that he testify consistently with what he told police on October 27, 2007, but that some of his testimony was not what he told police that day. For example, at trial, he testified that the passengers wore gloves while in the SUV, but initially he did not tell that to the police. Hernandez explained that initially he did not trust the police and did not tell them everything because he did not have a deal and that he was still a gang member at the time and the gang had rules against talking to the police. Hernandez did not recall stealing more than one car with Barragan the night before the shooting, but he had been "high."

¶ 23 Jaime Barragan testified that he was 21 years old and, in January 2007, he was living in De Kalb. Nevertheless, he had occasion to visit Aurora frequently, and, prior to moving to De Kalb in early 2007, he had lived in Aurora. In 2006, Barragan became a member of the Insane Deuces. Barragan testified to the colors and symbols used by the Insane Deuces and the Latin Kings. He explained that the Insane Deuces and the Latin Kings were rivals and that "false flagging" means throwing up the opposing gang's sign to see if it is returned. Barragan provided in-court identifications of Joshua and Justin and testified that they were Insane Deuces.

¶ 24 The evening of January 19, 2007, Barragan was at Caranza's apartment with Justin, Joshua, Rios, Montanez, and Hernandez. They were partying, smoking marijuana, and drinking alcohol. In the early morning hours of January 20, 2007, Barragan and Hernandez left the

apartment, intending to steal radios. They stole a radio and came across a running Ford Taurus. Barragan stole the Taurus,[2] and he and Hernandez eventually left the car at another gang member's house. After leaving the car, Barragan and Hernandez went looking for more radios, but came across a running black TrailBlazer. Barragan told Hernandez that it was his turn to steal a vehicle, but Hernandez refused. Barragan stole the TrailBlazer and, with Hernandez riding along, drove it back to Caranza's apartment. They went inside the apartment, saw that Joshua, Justin, and Rios were still there, and went to bed.

¶ 25    The next morning, Barragan and Hernandez told Rios about the TrailBlazer, and the three of them went outside to see it. When they returned, Justin and Joshua were awake. Joshua told Justin, Rios, and Barragan that he wanted to "put in work." According to Barragan, "putting in work" means shooting someone. They were in a bedroom, and Hernandez was in the living room. Justin showed them that he had a gun, specifically, a .40-caliber semiautomatic, and said that "that's the gun they want to put in work with." Barragan and Rios told the brothers about the "steamer" in the parking lot. Hernandez confirmed that the SUV had a temporary license plate. Later, they wanted to get something to eat and Hernandez wanted to go home, so Barragan, Joshua, Justin, and Hernandez left in the SUV. Consistent with Hernandez's testimony, Barragan testified that he drove, Joshua sat next to him, Hernandez sat behind Joshua, and Justin sat behind Barragan. Barragan drove to McDonald's and then into Latin Kings territory. Hernandez spoke about wanting to get rank in the gang.

¶ 26    They wound up on High Street and saw a boy and a girl walking down a sidewalk. The driver's side was closer to the sidewalk, and the boy was closer to the street and was wearing a

---

[2] Barragan explained that stolen cars are referred to as "steamers" and are used to commit shootings and robberies.

hooded sweatshirt. Justin started "gang banging with the boy," or false flagging, by saying "King love, Amore De Rey." The boy then "represented" by throwing up the Latin Kings crown. Barragan responded by flashing the Insane Deuces sign and saying "Deuce love, King Killer." Barragan continued driving, turned around, and drove back down High Street such that the passenger side was closer to the pedestrians. According to Barragan, he turned right at a stop sign and pulled into a driveway, intending to jump out to go beat up "the guy." However, he looked back and saw Justin pass Hernandez some gloves and a gun. It was the same gun Barragan saw earlier, in the apartment. Instead of getting out to "jump" the guy, Hernandez told Barragan to "drive up."

¶ 27 Barragan backed the car out of the driveway and returned to High Street, where he saw the boy and the girl "walking like right next to each other," with the boy closer to the street. He slowed the car down. When asked what he thought was going to happen at that point, Barragan responded, "I thought that most likely a shooting was going to happen." According to Barragan, Hernandez told him to slow down. Hernandez was supposed to do the shooting but Hernandez said that he "wasn't doing it" and passed the gun to Joshua. Hernandez passed the gun to Joshua between Joshua's seatbelt and the passenger door. Barragan saw Joshua with the gun; Joshua started shooting. Barragan heard three to five gunshots. The gunshots "surprised" him and he looked over and saw the boy fall. Barragan accelerated rapidly and drove away "recklessly," turning left onto Grove Street. Eventually, he stopped the car on Grove Street and used the sleeve of his hooded sweatshirt to quickly wipe down the steering wheel, the door handles, and everything he believed he had touched with his left hand (he was wearing only one glove). Further, Barragan previously had two cigars on his person and had smoked one; he tried to locate the other cigar before he left the TrailBlazer. They all exited the vehicle and split up, with

Barragan and Justin jogging to Barragan's grandmother's house and then returning to Caranza's apartment. Eventually, Hernandez and Joshua arrived, and Joshua and Justin bragged to Rios about the shooting. Barragan testified that Joshua received a tattoo of a spade on his back after the shooting.

¶ 28 Barragan testified that, on the drive back from his grandmother's house, Justin was bragging to Mitch Ayala (who had picked them up) about the shooting, saying, "we just handled business," which, in gang terms, means that they shot somebody. Barragan told Ayala to drive back to High and Grove Streets because Justin wanted to check out the area. They saw that the area was blocked by police tape and that there were police cars and a forensic truck. Justin then indicated to Barragan that, with respect to his former statement about handling business, they should tell Ayala that they were referring to something else, as if Justin then did not want anybody to know what just happened and that they were responsible for it.

¶ 29 Barragan was asked, "[B]etween the boy and the girl, which was significant to you?" He replied, "[T]he boy." Asked, "I mean, were you targeting the girl at all?" He answered, "[U]m." Then, "[Y]ou were worried about the boy, right?" Answer, "[Y]es, sir." He confirmed that the girl never threw up the crown or did anything else. They were talking about the boy while Barragan drove by and when he parked and was going to get out and beat "him" up. Barragan testified that "the girl" (presumably, harming her) would not give him any rank in the gang. After they turned around and returned toward the pedestrians, the boy walked toward the car while the girl was on the sidewalk; she did not come toward the car. When the boy was shot, the girl was on the sidewalk. Barragan did not see the gun pointed at her.

¶ 30 On October 29, 2007, Barragan was arrested in De Kalb. He lied, telling detectives that he was in De Kalb on the day of the shooting. Later, with his attorney, he reviewed all discovery

and read every statement made by each witness in this case. Barragan knew that he was facing a minimum of 35 years' imprisonment for the first-degree murder of Rodriguez and a minimum of 21 years' imprisonment for "the attempt first-degree murder of Claudia Lozano," which he expected would be served consecutively (for a 56-year minimum sentence). Barragan told the State that he wished to talk, and he agreed that, when he so notified the State, he was informed that he would not receive a deal if the State did not like what he had to say. Barragan agreed that he wanted a deal.

¶ 31     In exchange for his testimony against all codefendants, Barragan would plead guilty to attempted armed violence and aggravated battery on a public way, for a total of 18 years' imprisonment (at 50%). Under the agreement, Barragan expected that he would have around 5 more years left to serve, which he agreed was "better than" 56 years. Further, the State agreed to: (1) recommend that Barragan receive substance abuse treatment in prison; (2) try to get Barragan an "S Visa" to help him with immigration issues; (3) write a letter to "ICE" to help Barragan stay in the country; (4) try to house Barragan separately from the Cavazos brothers; and (5) call the jail where Barragan was staying to check on his request to become a trustee, which would allow him to move around the jail with more freedom than a typical inmate. The agreement required that Barragan tell the truth. Barragan testified that the State decides what is truthful.

¶ 32     Wesley Grant testified that he was once a member of the Insane Deuces and he knew the Cavazos brothers. In March 2007, Grant had a conversation with Justin at Justin's girlfriend's house. Other people, including Joshua and "Manny," were present and possibly within earshot. Justin and Grant were sharing "war stories," and Justin told Grant about the shooting on High Street. Justin told Grant that his brother was the shooter. Justin said that he, Joshua, Hernandez,

and "Jaime" were riding around certain neighborhoods, looking for Latin Kings and "false flagging." Justin told Grant that the victim returned the sign and then they shot him. Justin said that Hernandez had the gun first but that then, perhaps because he was afraid or intimidated, he gave the gun to Joshua.

¶ 33 Grant agreed that, in October 2007, he was charged with possession of a stolen motor vehicle and attempted armed robbery. He knew that he could receive up to 7 years' imprisonment for the possession of a stolen vehicle and 15 years' imprisonment for the attempted armed robbery, which could possibly run consecutively. When, in October 2007, the police asked Grant if he wanted to speak with them, he agreed. They asked Grant whether he knew anything about the shooting on High Street, and he initially did not tell them everything he had learned in his alleged March 2007 conversation with Justin. Grant did not have an attorney present, but he told the police that he knew that Joshua was the shooter, that the victim was walking with his girlfriend, and that he did not want to say more. In May 2008, however, with his attorney present, he "elaborated" and offered the police more information. When, in August 2008, he testified before the grand jury in Justin's case, he was aware that the charges against him remained pending. A few months later, in December 2008, he pleaded guilty to the charges and received the minimum sentence. He did not, however, ever have a formal agreement with the State's Attorney's office.

¶ 34 Ignacio Rios, 23 years old, testified that he was born in Mexico and currently lived there. He came to the United States when he was six years old and returned to Mexico about three years prior to trial. Because Rios was a deported convicted felon, the State's Attorney's office and the Aurora police department worked with Homeland Security to obtain Rios's presence at trial. On January 20, 2007, Rios lived in Aurora and was a member of the Insane Deuces. He

was at Caranza's apartment and was smoking marijuana. Rios had a conversation with Joshua, Justin, Hernandez, and Barragan. Justin displayed a .40-caliber silver semiautomatic handgun. Barragan and Justin spoke about finding a Latin Kings member to shoot. Joshua, Justin, Hernandez, and Barragan left the apartment, and Rios stayed in the apartment with Caranza. Rios and Caranza turned on a police scanner so they could hear if a shooting took place. Later, when the four men returned to the apartment, Hernandez stood to the side and did not actively participate in the conversation with the others. Joshua was acting happy and said that he wanted to change his name to "Whacko" because he "just whacked a King." Justin was acting excited too and was throwing up the crown and kissing it like he did when he was false flagging.

¶ 35    Rios was arrested in October 2007 and charged with attempted robbery and attempted unlawful possession of a motor vehicle. He gave a statement to police, hoping to get those charges dropped. In the statement, he said that, during the High Street shooting, Barragan was driving, with Justin in the front seat and Joshua and Hernandez in the back. At trial, he testified that he knew Barragan was the driver, but he was not positive where the others were sitting, because he was not there. Before the shooting, there was no discussion about who would be the shooter. When they returned, there was discussion about Hernandez "punking out." Rios told the grand jury that, upon their return to the apartment, the men were talking about how Justin saw a "guy" while they were driving by on High Street and Justin threw up the crown at him. They drove by again and Justin was going to shoot, but instead he gave the gun to Hernandez, who did not want to do it either. Hernandez gave the gun to Joshua. Rios confirmed that, when the men returned to the apartment, they discussed that Joshua was the shooter. Rios said that Joshua told him that he jumped out of the SUV to do the shooting. Barragan, Joshua, and Justin were excited and bragging, but Hernandez was not.

¶ 36                                    2. Other-Crimes Evidence

¶ 37    Prior to trial, the State moved *in limine* to admit, pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), evidence of a subsequent crime. Specifically, the State wished to introduce evidence that, after the shooting, Justin committed another attempted murder, wherein another Insane Deuces gang member supplied a "nation gun" to Justin, who again drove by people on a sidewalk in Aurora and targeted Latin Kings. Justin objected (presenting oral argument and case authority for his position). The court weighed the evidence's prejudicial effect against its probative value and ruled, over Justin's objection, that, with some minor distinctions, the similarities between the crimes were "so great" that the subsequent crime was admissible to show intent and motive.

¶ 38    At trial, the jury was informed:

> "You will hear evidence that the defendant has been involved in conduct other than that charged in the indictment. This evidence will be received on the issues of the defendant's intent and motive and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct, and if so, what weight should be given to this evidence on the issues of intent and motive."

¶ 39    Without objection, Trino Osario testified that he was currently serving a 20-year sentence for murder and that he was testifying pursuant to an agreement with the State. Once Osario testified in Justin's case, a pending murder count would be dropped. Osario testified that the State had already dropped one count of attempted murder, for which he had been facing 21 to 35 years' imprisonment that would have been served consecutively to his current 20-year term. Further, Osario had admitted to his sentencing judge that he had personally discharged the

firearm in the murder, which would have added on another 25 years (which, it was implied, his agreement with the State avoided).

¶ 40    Osario testified that, in 2007, he was a member of the Insane Deuces and knew both Cavazos brothers.  In addition, he confirmed that the "nation guns" in Caranza's apartment included .22-, .40-, and .357-caliber and 9-millimeter guns.  Osario testified that, in the evening of January 20, 2007 (after Rodriguez and Lozano were shot), he was at Caranza's apartment with Caranza and Justin.  Osario testified that, although he was not sure, he thought that at that time Justin was wearing a black, hooded sweatshirt and had a short goatee.  According to Osario, who is about 6 feet 1 inch tall, Justin is shorter, approximately 5 feet 9 inches tall.  The three men left the apartment, and Caranza drove his black Nissan Titan truck to take Justin to his girlfriend's house.  Before they reached her house, when they were less than one block away, they saw a group of people standing in front of a bar (the Head Stone Inn).  Caranza said that the people looked like Latin Kings members.  Caranza made a U-turn, drove by the bar again, and repeated his belief that the people were Latin Kings members.  Osario disagreed, but Caranza drove behind the bar and stopped his truck less than one block away.  Caranza told Justin to shoot the "guys" in front of the bar.  Justin had a .22-caliber gun with him (which Osario saw immediately before they left Caranza's apartment).  Justin exited the truck and headed toward the bar. Caranza did not drive away because he wanted to hear gunshots first.  Osario and Caranza lost sight of Justin, and then they heard four or five gunshots coming from the front of the bar. Caranza drove off; Osario looked behind him and saw Justin running up the street toward his girlfriend's house.  Osario testified that, eventually, the .22-caliber weapon was returned to Caranza's apartment and that Osario later used it for an attempted murder and hid it in his uncle's basement.  Osario eventually told police where it was located.

¶ 41    Without objection, Juan Leon testified that, in the evening of January 20, 2007, he was outside with some friends in front of the Head Stone Inn when a black Nissan Titan truck slowly drove by them (at least twice, maybe three or four times).  Leon took notice of the truck because he was considering buying one.  The truck turned around a corner and, shortly thereafter, a man, possibly Hispanic, with a black, hooded sweatshirt and a goatee, shot at him.  Leon was hit by a bullet in his right calf.  Leon is approximately 5 feet 10 inches tall.  The shooter appeared to be shorter.

¶ 42    The jury retired for the day, and, upon its return the next day, it was again instructed that it would hear other-crimes evidence that was to be considered only for the limited purpose of Justin's intent and motive.  The State then re-called Barragan.

¶ 43    Without objection, Barragan testified that, around January 23, 2007, at Caranza's apartment, he had a conversation with Justin and Joshua about a shooting that occurred on January 20, 2007, after the Rodriguez and Lozano shooting.  Barragan asked where the .22-caliber handgun was located, because he wanted to use it.  Joshua said that Justin had used it to shoot some Latin Kings in front of a bar.  Justin stated that he had burned the shoes and the hooded sweatshirt that he was wearing on January 20, 2007.  Further, Justin said that he went to his girlfriend's house after the second shooting.  Barragan testified that Justin's girlfriend lived down the street from the bar where the shooting occurred.

¶ 44    The parties stipulated that five .22-caliber spent cartridge casings were found on the sidewalk outside of the Head Stone Inn and that all were fired from the same firearm.  A .22-caliber handgun was found in the basement crawlspace in a home in Aurora; the spent casings were determined to have been fired from that gun.

¶ 45                            3. Officers' Testimony

¶ 46    Detective Angel Nieves testified that he investigated the High Street shooting. On October 23, 2007, when the police were interviewing him on unrelated charges, Rios gave them a lead about the High Street shooting. Upon review of four different photo arrays, Rios identified: (1) Joshua as the person who shot Rodriguez; (2) Barragan as the person who stole and drove the vehicle used in the shooting; (3) Justin as the individual who, just before the incident, displayed a handgun and, later, produced in the vehicle the handgun that was used in the shooting; and (4) Hernandez as having been present with the three other individuals in the vehicle during the shooting. On October 27, 2007, Nieves interviewed Hernandez and showed him multiple photo arrays. Hernandez identified Joshua as the person who shot Rodriguez, Justin as the person who provided the handgun that was used in the shooting, and Barragan as the driver of the stolen vehicle used in the shooting. On May 20, 2008, Nieves interviewed Grant at the Kendall County jail and showed him a photo array. Grant picked out Justin as having been with Joshua during the shooting

¶ 47    Before trial, the State had moved *in limine* to introduce gang expert testimony through Sergeant Jeffrey Wiencek. Justin objected (again, presenting oral argument and case authority for his position). Over Justin's objection, the court granted the motion, primarily on the basis that the expert's testimony might aid the jury's understanding of an otherwise unexplainable act.

¶ 48    At trial, without objection, Wiencek testified that, in Aurora, gangs typically create symbols and slogans to identify themselves. For example, the Insane Deuces use the slogans "Deuce Love" and "Amor De Deus," and they use a hand signal that looks like an exaggerated peace sign. The Latin Kings use the slogans "King Love" and "Amor De Rey," and they use a hand signal that resembles a three-point crown. Further, each gang wears different colors: black and green for the Insane Deuces and black and gold for the Latin Kings.

¶ 49    Street gangs in Aurora are classified into two umbrella organizations. The "People Nation" includes the Latin Kings, and the "Folk Nation" includes the Insane Deuces. They do not get along. Although gang members typically display their gang signs to other members to signify their membership in that gang, on "very, very rare" occasions gang members use a sign of another gang. For example, to show disrespect for the Latin Kings, an Insane Deuces member might exhibit the Latin King sign upside down. Also, an Insane Deuces member might use the Latin King sign when "false flagging." False flagging is:

> "basically baiting another gang to figure out if a person is going to be a member of that street gang; and then what they could do is they could throw up the rival gang's hand sign to see if that member would then throw it back to them. If they do, they can then confirm their gang affiliation; and then based upon that, they could decide what's going to happen afterwards. It could be a beat-down, it could be a shooting, it could be other things."

¶ 50    Wiencek further testified that the gangs claimed territories within Aurora and that, in 2007, the area of High Street and Grove Street was "definitely the Latin King territory." Wiencek explained that, generally, gang activities are aimed at helping the gang flourish. For example, gang members commit robberies and sell drugs to acquire money for the gang. To protect gang territory, members acquire guns and go "hunting" for rivals. "Hunting" is actively searching for rival gang members to hurt or kill. The purpose behind hunting is to: (1) take out enemies who are hunting members of one's own gang; (2) hold territory by showing the rival gang that one's own gang is strong; (3) show the rival gang the location and boundaries of one's own gang's territory; and (4) show members of one's own gang that he or she is "down for the cause" or has love for and commitment to the gang. Wiencek testified that gang members often wear gloves to avoid leaving evidence, such as fingerprints or DNA, behind at a crime scene. In

addition, gangs in Aurora operate with a "code of silence," where gang activities are not shared with people outside of the gang or with law enforcement. That code is sometimes broken and, as a consequence, the code violator is kicked out of the gang and might be threatened or treated with violence.

¶ 51 The Aurora police department gathers information about street gangs and prepares reports, classifying gang affiliates as either members, associates, or "others." "Others" is a default category, encompassing persons who might be involved in some form of gang activity. "Associates" are persons with whom the police have had at least one contact, with the presence of two or more criteria (for example, wearing gang colors, wearing clothing in a manner indicative of gang involvement, using gang slogans, etc.). Individuals are classified as "members" by personal admission, by gang tattoos on their bodies, or if, within a one-year period, the police have three contacts, with two or more criteria present. Through his professional experience in the Aurora police department's gang unit, Wiencek knew that, in 2007, Carranza was classified as an Insane Deuces member who owned an apartment that was used as a gang hangout and a base for missions. In addition, Justin and Joshua were Insane Deuces members. Wiencek was aware that Joshua had two tattoos of spades, the primary symbol of the Insane Deuces, one on his right hand on or between his fingers, and a large one on his back. Wiencek identified photographs thereof and testified that the police first observed the tattoo on Joshua's hand in 2005 or 2006 and first noticed the tattoo on Joshua's back around May 2007. When asked if he had any doubt that Justin was an Insane Deuces member, Wiencek replied, "none." Justin had numerous contacts with the police department between February 2006 and July 2007, was found in Insane Deuce hangouts, was in the presence of numerous gang members, wore the gang's colors, and admitted to Officer Jay Ellis that he was an Insane Deuces

member. Finally, Wiencek testified that Rodriguez was not classified as a street gang member but that he was affiliated with the Latin Kings and his older brother was a Latin Kings member.

¶ 52    The State rested. The court denied Justin's motion for a directed verdict.

¶ 53                    B. Defense Case, Rebuttal, Closing, and Instructions

¶ 54    Nieves testified that, when he interviewed Hernandez in October 2007, Hernandez stated that he did not want to be a "snitch" unless he was guaranteed a deal. Nevertheless, Nieves testified, that day Hernandez was not offered a deal, he talked without a deal, and, despite talking, he was taken into custody. Nieves testified that Hernandez did not immediately recognize the SUV from a photograph; however, Hernandez did recognize it when shown a photo of the back of the car with the temporary plate and dealership decal.

¶ 55    Vicki Lefter Dieter testified that, on January 20, 2007, she was driving and turning left onto Grove Street in Aurora when she and her sister "could have died in a very bad accident because the driver of the car was going at a high rate of speed, and he didn't stop at his stop sign. He just proceeded through it going as fast as he could get the vehicle to move." The car was a large new black SUV. The driver was a "large female with a lot of hair" and was Hispanic. At trial, Dieter remembered that the driver was wearing glasses and had long hair that was pulled up and hanging; "you could see that she had used a product on her hair. Her hair was shiny, and you could just tell when somebody is using a product on their hair." The driver was dressed in dark clothing, which Dieter believed was a black coat. Dieter also saw a small-framed Hispanic man in the front passenger seat. She did not see anyone else in the car. Dieter continued driving and saw a boy lying on the street and a girl trying to revive him. Dieter told her sister to call 911, and she got out of the car to help. Police arrived and, ultimately, took Dieter down Grove Street to identify a car. The car looked like the one that almost struck her in the intersection.

¶ 56   Dieter agreed that, because the car was going extremely fast and "blew through" a stop sign, she had only a split second to look at the driver. She did not recall telling an officer immediately after the incident that she saw only a Hispanic male in the speeding car. She did not recall telling officers that the driver had shoulder-length hair, possibly with curls or a coarse look. Justin rested.

¶ 57   On rebuttal, the State called Officer Richard Galarza, who testified that, on January 20, 2007, he interviewed Dieter near the intersection of High and Grove Streets. She told him that the driver of the vehicle had shoulder-length, possibly curly or coarse hair. In addition, she stated that she saw only one person in the car, the driver. She did not mention seeing a Hispanic male in the car.

¶ 58   In closing arguments, the State argued that Justin's intent to hunt and murder a rival gang member was reflected by his conversations in Caranza's apartment, his display of a handgun, his bringing the handgun into the SUV, and his decision to hand the gun and the gloves to Hernandez after "gang-banging" with Rodriguez. Accordingly, the State argued, Justin was accountable for Joshua's actions and shared his intent and the common criminal design to shoot members of the Latin Kings. Further, it noted: "How do we know that when this defendant was given the opportunity to shoot at a rival gang member, he will do it? Why? Because he did it again later that night with more senior members of his gang." Also, "[a]nd that's what this defendant does as an Insane Deuce street gang member. He looks to hunt and kill rival street gang members. He had a busy day on January 20th, 2007."

¶ 59   Defense counsel argued in closing that, while the question in the State's case against Joshua was whether he fired the gun, the important question in its case against Justin was whether the evidence proved beyond a reasonable doubt that "Justin took part in this, that Justin

- 22 -

was in that car? *** What is the evidence beyond a reasonable doubt that Justin was actually in that car?" Further, counsel argued that the evidence regarding the second shooting, which the State asserted was relevant to motive and intent, was actually irrelevant: "if you believe Justin was in the car, then you don't need to know about the second shooting. *** Motive and intent is all you can use it for. If you believe Justin's in the car in the first place, then you already have motive and intent established by every other gang member and gang evidence that came in."

¶ 60                                    C. Jury Verdict and Sentence

¶ 61    The jury convicted Justin of two counts of first-degree murder and found that, for both counts, the State had proved that he, or one for whose conduct he was legally responsible, did so while armed with a firearm. In addition, the jury convicted Justin of attempted first-degree murder and found that he, or one for whose conduct he was legally responsible, did so while armed with a firearm. Finally, the jury convicted Justin of aggravated discharge of a firearm and unlawful possession of a stolen motor vehicle.

¶ 62    The court denied Justin's motion for a new trial. At sentencing, the trial court reviewed its "170 pages of notes" from the trial, the presentence report, "which because of Justin's age has mostly his juvenile record," the financial impact of incarceration, and the aggravating and mitigating evidence. The court sentenced Justin to 20 years' imprisonment for first-degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2006) (providing range of 20 to 60 years)), with a firearm add-on of 15 years (see 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006)). For attempted first-degree murder, the court sentenced Justin to 10 years' imprisonment (see 730 ILCS 5/5-8-1(a)(3) (West 2006) (providing range of 6 to 30 years)), with a firearm add-on of 15 years. The murder and attempted-murder sentences are to be served consecutively (see 730 ILCS 5/5-8-4(d) (West 2006)). Finally, the court sentenced Justin to five years' imprisonment for possession of a stolen

motor vehicle (see 730 ILCS 5/5-8-1(a)(5) (West 2006) (providing range of three to seven years)), to run concurrently with the attempted-murder sentence. The sentences total 60 years' imprisonment.

¶ 63　Justin moved to reconsider the sentences, particularly in light of his age and the fact that he was not the shooter. He asked that the court reduce to their respective minimums the sentences for attempted murder and possession of a stolen motor vehicle. The court denied Justin's motion, noting that it had given the sentences a great deal of thought and had tried to make the sentences close to those received by Joshua (which totaled 75 years' imprisonment (20 years for murder with a 25-year add-on, 10 years for attempted murder with a 20-year add-on, and 3 years for possession of a stolen motor vehicle)). Justin appeals.

¶ 64　　　　　　　　　　　　　II. ANALYSIS

¶ 65　　　　　　　　　　　　A. Evidentiary Arguments

¶ 66　Justin's first two arguments on appeal concern evidentiary rulings. Specifically, he argues that the trial court erred in admitting: (1) evidence of subsequent bad acts; and (2) Wiencek's gang-related testimony. We note that, in their briefs, the parties debate whether Justin forfeited these issues because, although he objected to and argued against the State's motions *in limine* to admit the evidence and he raised the issues in his posttrial motion, he did not, when the evidence was introduced at trial, contemporaneously object. However, after briefing in this case was complete, we granted Justin's motion to cite our supreme court's recent decision in *People v. Denson*, 2014 IL 116231, ¶¶ 18, wherein the court confirmed that, in criminal cases, even absent a trial objection, issues may be preserved where the defendant raises them in response to motions *in limine* and again raises them in a posttrial motion. Accordingly, Justin has not forfeited these arguments.

¶ 67                                    1. Evidence of Subsequent Crime

¶ 68    As noted above, before trial, the State moved *in limine* to introduce evidence that, on January 20, 2007, after the charged shooting of Rodriguez and Lozano, Justin was involved in another gang-related shooting (the shooting of Leon). The State argued that the other-crimes evidence was relevant to establish Justin's motive and intent in committing the charged shooting. The trial court granted the State's motion, finding that the subsequent crime was similar to those charged and that it was relevant for purposes of establishing motive and intent.

¶ 69    On appeal, Justin argues that the court erred because motive and intent were not at issue. Specifically, Justin asserts that his trial defense was that the evidence was insufficient to establish that he was present in the SUV during the charged shooting. He did not contend at trial that the shooting was not gang related or that there was no intent to kill. Further, Justin argues that the evidence was neither relevant for any purpose besides propensity nor sufficiently similar to the charged crimes and, accordingly, was unduly prejudicial. Justin notes that the evidence took the jury's focus off of the charged crimes, creating a trial within a trial, and he asserts that the State effectively conceded that the evidence was relevant only for propensity when it argued to the jury, "How do we know that when this defendant is given the opportunity to shoot at a rival gang member, he will do it? Why? Because he did it again later that night."

¶ 70    Evidence of other crimes is inadmissible if its only relevance is to establish a defendant's propensity to commit crimes. Ill. R. Evid. 404 (eff. Jan. 1, 2011); *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); *People v. Bartall*, 98 Ill. 2d 294, 309-10 (1983). However, such evidence, even concerning crimes that occur *after* the charged crime (*Bartall*, 98 Ill. 2d at 309-10), may be admitted if: (1) it is relevant for a purpose other than propensity, such as motive or intent (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)); (2) it bears "some threshold similarity to the crime charged"

(*People v. Cruz*, 162 Ill. 2d 314, 348-49 (1994)); and (3) its probative value outweighs its prejudicial impact (*People v. Chapman*, 2012 IL 111896, ¶ 19). If it is admitted, the State should avoid putting on "a trial within a trial" on the other crime. *Bartall*, 98 Ill. 2d at 315. Although other-crimes evidence is prejudicial, "[e]rroneous admission of other-crimes evidence calls for reversal only if the evidence was 'a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different.' " *People v. Adkins*, 239 Ill. 2d 1, 23 (2010) (quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000)). A trial court's decision to admit other-crimes evidence is reviewed for an abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). An abuse of discretion occurs where the decision is arbitrary or fanciful or no reasonable person would adopt the trial court's view. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 71     We conclude that the trial court did not abuse its discretion in admitting the other-crimes evidence. First, Justin asserts that motive and intent were not truly at issue and were improper bases for admitting the evidence. He notes that the only issue he challenged was whether he was present in the SUV at the time of the shooting. However, we agree with the State that Justin's view of intent is too restricted. For example, in *People v. Heard*, 187 Ill. 2d 36, 59-60 (1999), our supreme court rejected the defendant's argument that, where he denied involvement in the crime, only the identity of the perpetrator, not the motive and intent of the perpetrator, was at issue and, accordingly, the other-crimes evidence was improperly admitted to show motive and intent. The court held:

> "This argument is not persuasive. Although the evidence readily demonstrated that the
> shooter intended to kill the victims, the prosecution had to prove that defendant was the
> shooter. The prosecution introduced other-crimes evidence to prove *defendant's* motive

and intent to kill the victims, thus providing further proof of defendant's identity as the shooter." (Emphasis in original.) *Id.* at 60.

Similarly, here, Justin's argument ignores that, *regardless of his defense*, the State had to prove Justin's intent beyond a reasonable doubt. Specifically, the State had to prove that Justin was in the SUV *and* that, for purposes of accountability, *he shared* Joshua's intent to commit first-degree and attempted murder. See *People v. Henderson*, 142 Ill. 2d 258, 319 (1990) ("[W]hen a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact, even if the defendant offers to stipulate to those same facts"). Accordingly, the subsequent crime, reflecting that Justin was responsible for shooting a rival gang member—indeed, a purported Latin Kings member—later that same evening, was relevant to the State's theory that, at the time of the charged shooting, Justin shared Joshua's intent.

¶ 72    Second, we disagree that the evidence improperly created a trial within a trial or that the subsequent crime was not sufficiently similar to the charged crimes to be relevant. This case is unlike *People v. Bedoya*, 325 Ill. App. 3d 926, 940-41 (2001), a case upon which Justin relies, where the court found that the State's presentation of 7 witnesses and 27 exhibits to establish the defendants' other crimes was "overkill" and served no purpose other than to inflame the jury. The other-crimes evidence here was not excessive, as the State presented only three witnesses with respect thereto and Justin stipulated to a few facts related to the subsequent crime. Further, although the subsequent shooting occurred on foot and several hours after the first shooting, "threshold similarity" or "general areas of similarity" will suffice to render the other-crimes evidence relevant. *People v. Cruz*, 162 Ill. 2d 314, 348-49 (1994); see *Bartall*, 98 Ill. 2d at 310 (evidence of a shooting that occurred 20 hours after the charged crime admissible to show the

defendant's intent in the charged murder); *People v. McKibbins*, 96 Ill. 2d 176, 185-86 (1983) (evidence of a robbery that occurred two days after the charged crimes admissible to show the defendant's intent in the charged murder and robbery); *cf. People v. Hansen*, 313 Ill. App. 3d 491, 501-02 (2000) (evidence of subsequent crimes that occurred in the 1960s and 1970s inadmissible to show the defendant's motive in 1955 murder). The trial court here acknowledged that there existed "minor distinctions" between the crimes; however, it properly determined that the similarities, including that, after driving by and identifying alleged Latin Kings members on the street, Insane Deuces members supplied a "nation gun" to Justin to commit a shooting, sufficed to render it relevant. As the evidence was relevant and not excessive or unduly prejudicial, we cannot find that the court abused its discretion in admitting it.

¶ 73   We further note that, even if we were to accept Justin's argument that the evidence was erroneously admitted, reversal remains unwarranted. Again, the erroneous admission of other-crimes evidence generally requires reversal only where, without the evidence, the verdict likely would have been different. *Adkins*, 239 Ill. 2d at 23. Here, the testimony of four witnesses (Hernandez, Barragan, Grant, and Rios) established that Justin was present during and provided the gun used in the charged shooting. Defense counsel vigorously challenged the credibility of those witnesses, but the jury nevertheless chose to credit their testimony. As such, we do not agree that, absent the evidence of the later shooting, Justin would likely have been acquitted.

¶ 74                           2. Gang Expert Testimony

¶ 75   Justin argues next that the court erred in admitting Wiencek's testimony, because it was cumulative to that of other witnesses and because his status as a police officer and gang expert served only to bolster the credibility of the other witnesses.

¶ 76    Generally, gang evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. *People v. Smith*, 141 Ill. 2d 40, 58 (1990). Before admitting the evidence, however, the court must weigh its probative value against its prejudicial effect. *People v. Morales*, 2012 IL App (1st) 101911, ¶ 39. A court's decision to admit expert testimony is reviewed for an abuse of discretion. *Becker*, 239 Ill. 2d at 234.

¶ 77    Here, gang membership was clearly relevant; indeed, it was at the heart of the charged crimes. As the trial court noted, Wiencek's expertise and knowledge regarding gangs in Aurora, their operations, and their motives for committing certain crimes were relevant to explain an otherwise inexplicable act, *i.e.*, why a group of young men would drive by and shoot, for no apparent reason, two young people whom they did not know. While Justin cites *People v. Howard*, 305 Ill. App. 3d 300, 309 (1999), for the proposition that the State should not be permitted to use expert testimony to bolster witness credibility, that case involved an expert witness on the subject of battered-woman syndrome who testified that there was no evidence that a witness was lying, which the court found invaded the province of the jury to make credibility determinations. *Id.* at 308-09. Here, Wiencek's testimony did not comment on the credibility of the other witnesses but, again, was offered to help explain the environment that would lead to an otherwise inexplicable act.

¶ 78    Further, we disagree that the fact that the evidence was partly cumulative rendered it more prejudicial than probative. Under the facts of this case, we think that the extent to which Wiencek's testimony was cumulative to that of other witnesses served, if anything, to reduce its prominence. See, *e.g.*, *People v. Denson*, 2013 IL App (2d) 110652, ¶ 24 (applying harmless-error analysis, but noting that, where the improperly admitted evidence was merely cumulative or duplicated properly admitted evidence, the error was harmless).

¶ 79    Finally, Wiencek's testimony that Justin was a member of the Insane Deuces was proper. While bare testimony from lay witnesses is not sufficient to establish gang membership, testimony of gang membership may be received from "a police officer specializing in gang crimes, where the basis of the officer's assertion is presented to the fact finder." *People v. Williams*, 262 Ill. App. 3d 808, 820 (1994). Justin argues that the testimony from gang witnesses here was not "bare testimony," but clearly came from personal knowledge that was arguably superior to Wiencek's. Nevertheless, the question is whether no reasonable person would agree with the trial court's decision to admit Wiencek's testimony, a question we answer in the negative because, again, it helped to explain an otherwise inexplicable act. Accordingly, the court did not abuse its discretion in admitting Wiencek's testimony.[3] *People v. Herron*, 215 Ill. 2d 167, 184 (2005).

¶ 80                    B. Constitutional Arguments

¶ 81    Justin's final argument on appeal is that the confluence of various statutes that led to his convictions and sentences is unconstitutional. Specifically, Justin argues that the "excluded jurisdiction" provision of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2006))—which provides that minors 15 years old or older who commit certain crimes, including first-degree murder, be excluded from juvenile court—unconstitutionally subjects minors to adult prosecution and sentencing without any consideration of their youthfulness and its attendant circumstances. See 705 ILCS 405/5-130(1)(a)(i) (West 2006). Justin further notes that section 5-130 of the Juvenile Court Act, while not a sentencing statute,

---

[3] We note that Justin argues that the cumulative effect of the evidentiary errors deprived him of a fair trial. Again, however, we have found no error and, therefore, his cumulative-error argument fails.

has sentencing implications because subjecting minors to adult court subjects them to the combined application of provisions for mandatory firearm enhancements, mandatory consecutive sentencing, and "truth in sentencing." Justin contends that the confluence of these provisions was unconstitutional because it did not permit consideration of his youth at the time of the offense and that the provisions violate the eighth amendment and the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) (which are read co-extensively (see *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006))).[4]

¶ 82    A challenge to the constitutionality of a statute may be raised at any time. *In re J.W.*, 204 Ill. 2d 50, 61 (2003). We review *de novo* arguments concerning the constitutionality of statutes. *People v. McCarty*, 223 Ill. 2d 109, 135 (2006). Further, we presume that all statutes are constitutional and, where possible, must construe a statute to uphold its constitutionality. *People v. Vasquez*, 2012 IL App (2d) 101132, ¶ 53.

¶ 83    Justin argues that his constitutional arguments must be assessed in light of recent United States Supreme Court decisions, which, he argues, have significantly changed the law concerning the treatment and sentencing of minors. Those cases, he asserts, make clear that there exist fundamental differences between juveniles and adults, such that juveniles may not be prosecuted and sentenced in the same manner as adults without consideration of youth and its attendant circumstances. See *Miller v. Alabama*, __ U.S. __, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551, 569-73 (2005).

---

[4] Justin's constitutional arguments essentially mirror those raised in Joshua's appeal, and we reject them for the same reasons. See *Cavazos*, 2015 IL App (2d) 120171, ¶¶ 92-102. We note, however, that, unlike Joshua, Justin does not argue that the statutes violate due process.

¶ 84    Indeed, there is really no question from those cases that there exists a growing trend to acknowledge that juvenile offenders are inherently different from adult offenders and that, therefore, what might be constitutional as applied to an adult might not meet constitutional muster when applied to a juvenile.  See, *e.g.*, *People v. Willis*, 2013 IL App (1st) 110233, ¶ 47. Specifically, in *Roper*, the Court held that capital punishment for juvenile offenders violates the eighth amendment.  *Roper*, 543 U.S. at 568.  In *Graham*, the Court held that, when imposed on a juvenile offender for a crime other than homicide, a life sentence without the possibility of parole violates the eighth amendment.  *Graham*, 560 U.S. at 74.  The *Graham* Court nevertheless noted that "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life."  *Id.* at 75. Most recently, in *Miller*, the Court held that, even for those convicted of homicide, the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."  *Miller*, ___ U.S. at ___, 132 S. Ct. at 2469.  The Court noted that, under the sentencing scheme at issue, the sentencing court was prevented from considering that the juvenile was not as culpable and had a "greater capacity for change" than an adult in similar circumstances.  (Internal quotation marks omitted.)  *Id.* at ___, 132 S. Ct. at 2460.  The Court continued that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at ___, 132 S. Ct. at 2469.  *Roper*, *Graham*, and *Miller* all considered that, as compared with adults, juveniles lack maturity, have an underdeveloped sense of responsibility, and are more easily influenced by peer pressure, and, because the character of a juvenile is not yet fully formed, his or her personality traits remain susceptible to change.  *Roper*, 543 U.S. at 569-70; *Graham*, 560 U.S. at 68; *Miller*, ___ U.S. ___, 132 S. Ct. at 2464-65.

¶ 85    Nevertheless, we reject Justin's constitutional arguments.  Simply put, despite the foregoing Supreme Court decisions, courts in this state have consistently rejected the arguments he raises here.  We will not repeat the same analyses that have, essentially, been set forth at length multiple times.  Suffice it to say, however, that section 5-130 of the Juvenile Court Act has consistently been upheld as constitutional, generally on the basis that, unlike the statutes at issue in *Roper*, *Graham*, and *Miller*, it is not itself a sentencing statute and, therefore, imposes no sentence.  Rather, section 5-130 determines only where a juvenile is to be tried.  Thus, courts have held that section 5-130 is not subject to and does not violate the eighth amendment or proportionate penalties clause**.**  See, *e.g.*, *People v. Patterson*, 2014 IL 115102, ¶¶ 89-111 (section 5-130 of the Juvenile Court Act does not violate due process, the eighth amendment, or the proportionate-penalties clause); *People v. Harmon*, 2013 IL App (2d) 120439, ¶¶ 54-56, 59-62 (despite holdings in *Miller*, *Roper*, and *Graham*, neither section 5-120 nor section 5-130 of Juvenile Court Act violates eighth amendment); *People v. Willis*, 2013 IL App (1st) 110233, ¶ 53 (despite holdings in *Miller*, *Roper*, and *Graham*, section 5-130 does not violate eighth amendment or proportionate-penalties clause); *People v. Pacheco*, 2013 IL App (4th) 110409, ¶¶ 55, 65 (same);[5] *People v. Jackson*, 2012 IL App (1st) 100398, ¶¶ 17, 19 (despite holdings in

---

[5] On June 26, 2014, this court entered an order holding our disposition of this case in abeyance until our supreme court rendered a decision in *Pacheco*, 2013 IL App (4th) 110409, *appeal allowed*, No. 116402 (Sept. 25, 2013), or *People v. Jenkins*, 2013 IL App (1st) 103006-U, *appeal allowed*, No. 115979 (Sept. 25, 2013).  On January 27, 2015, however, the supreme court found that those petitions for leave to appeal were improvidently granted and, therefore, it vacated those orders and denied the petitions.  Accordingly, this disposition no longer needs to be held in abeyance.

*Roper* and *Graham*, section 5-130 does not violate eighth amendment or proportionate-penalties clause); *People v. Salas*, 2011 IL App (1st) 091880, ¶¶ 66, 76-80 (same).

¶ 86    Further, courts have also rejected the argument that section 5-130's sentencing implications, whereby juveniles are subject to automatic application of adult sentences and "truth in sentencing" provisions, are unconstitutional.  See, *e.g.*, *Patterson*, 2014 IL 115102, ¶¶ 100-11; *Pacheco*, 2013 IL App (4th) 110409, ¶¶ 57-58, 60.  The court in *Pacheco* noted that, taken to its logical extension, the argument suggests that it is unconstitutional to subject a juvenile to the same mandatory minimum sentence as an adult, a result *not* warranted by the *Miller*, *Graham*, and *Roper* holdings, which concerned only the harshest possible penalties.  *Pacheco*, 2013 IL App (4th) 110409, ¶ 58.  Indeed, *Miller* states that "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the *harshest possible penalty* for juveniles." (Emphasis added.)  *Miller*, ___ U.S. ___, 132 S. Ct. at 2475.  Further, the *Miller* court expressly declined to foreclose a life sentence without parole for a juvenile in a homicide case (although it suggested that the occasions whereby such sentences would be appropriate would be "uncommon").  *Id.* at ___, 132 S. Ct. at 2469.

¶ 87    Here, Justin did not receive the "harshest possible penalty," *i.e.*, he did not receive a natural-life sentence without the possibility of parole.  Indeed, he received the minimum sentence possible for murder, only four years more than the minimum for attempted murder, and only two years more than the minimum for possession of a stolen motor vehicle.  Justin argues, in part relying on life-expectancy tables, that the 60 years imposed nevertheless constitute a "*de facto*" life sentence.  However, courts have rejected such an argument, noting that there are distinct differences between a sentence of natural life without parole and a sentence of a

determinate, albeit lengthy, number of years. See, *e.g.*, *Patterson*, 2014 IL 115102, ¶¶ 107-11; *People v. Gay*, 2011 IL App (4th) 100009, ¶¶ 19-20, 22-25 (the defendant's aggregate 97-year sentence was not a *de facto* life sentence without parole).

¶ 88    Further, to the extent that the Supreme Court decisions can be read broadly as requiring that, before sentencing a juvenile, the sentencing body must have an opportunity to take into account the juvenile's youth at the time of the crime, that requirement was satisfied here. See *Harmon*, 2013 IL App (2d) 120439, ¶¶ 54, 62. The court in this case expressly acknowledged Justin's youth and considered mitigating factors before imposing the sentence. Again, after doing so, the court imposed the minimum term of imprisonment for murder, only four years above the minimum for attempted murder, and only two years above the minimum for possession of a stolen motor vehicle. Moreover, while the aggregate number of years is indeed significant, it must be remembered that Justin was convicted of murdering one 15-year-old and attempting to murder a second one.

¶ 89    The fact that consistent with our sister courts we reject Justin's arguments regarding the sentencing scheme at issue is not to say that we take his arguments lightly. The Supreme Court has, indeed, made very clear that, for constitutional purposes, some consideration must be made of the fact that juveniles and adults are inherently different. The courts in *Patterson*, *Willis*, and *Pacheco* note that whether the current sentencing scheme in Illinois, which requires certain juveniles to be tried and sentenced as adults, continues to be sound policy in this State is for the General Assembly, not courts, to decide, and they suggest that a renewed discussion on the subject might be warranted. *Patterson*, 2014 IL 115102, ¶ 111; *Willis*, 2013 IL App (1st) 110233, ¶¶ 54-58; *Pacheco*, 2013 IL App (4th) 110409, ¶¶ 67-68. We do not disagree, and we join that call.

¶ 90   In that vein, we note that we find particularly troubling the current limitations placed upon a sentencing court's discretion when mandatory sentencing enhancements are at play for a juvenile offender.  Although the sentencing court is aware that it must apply the enhancements, the fact remains that, even if the court determines that, due to the attendant circumstances of youth, a minimum sentence for a juvenile is warranted, it cannot deviate from the mandatory add-ons that might be greater punishment than it found appropriate for the underlying crime.  For example, here, the court determined that 20 years' imprisonment was appropriate for Justin's decision to take another's life.  However, it was required to impose another 15 years to that sentence because Justin (or one for whose conduct he was responsible) did so with a firearm. 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006).   Similarly, the court determined that 10 years' imprisonment should be imposed for Justin's attempted murder of a young girl.  However, it was required to impose another 15 years, indeed *more* than the underlying sentence, because Justin (or one for whose conduct he was responsible) did so with a firearm.  *Id.*  We do not suggest that the crimes at issue here or the use of a firearm during those crimes should be punished lightly, or that the instant sentence is inappropriate, but where there exists an evolving trend that the attendant circumstances of youth must be considered at sentencing, the court's restricted discretion and required imposition of an add-on that is more than what the court determines is reasonable for the underlying offense should, in our opinion, be revisited.

¶ 91                                   III. CONCLUSION

¶ 92   For the forgoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 93   Affirmed.