2022 IL App (2d) 210372-U
No. 2-21-0372
Order filed October 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-42 |
| JOHN A. YANNI, III, | ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not abuse its discretion in finding a lack of extraordinary circumstances requiring probation when imposing defendant's sentence for aggravated driving under the influence causing death. The trial court's findings in aggravation did not constitute double enhancement. The admitted victim impact statements had no prejudicial effect on the trial court's imposition of defendant's sentence.

¶ 2   Defendant, John A. Yanni, entered an open guilty plea to two counts of aggravated driving under the influence and was sentenced to a concurrent term of six years' imprisonment. He appeals from the denial of his motion to reconsider sentence, contending that the trial court erred in finding a lack of "extraordinary circumstances" pursuant to section 11-501(d)(2)(G) of the Illinois Vehicle

Code (the Code) (625 ILCS 5/11-501(d)(2)(G) (West 2020). Defendant also argues that the trial court's findings in aggravation constituted double enhancement, and that it erred in allowing an excessive amount of victim impact statements. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     On January 17, 2017, defendant was at a Schmidt's Tavern in Elburn before driving a vehicle westbound on Route 38, east of Peace Road. His vehicle crossed the centerline and struck a vehicle driven by Johnathon Ode. Evan Cortez was a passenger in Ode's vehicle. Police officers responded to the scene of the accident and spoke to defendant. Officers noted that defendant had a strong odor of an alcoholic beverage and bloodshot, glassy eyes. Defendant admitted that he had been consuming alcoholic beverages at the Elburn bar. A blood kit was taken from defendant, and his blood alcohol content was .125.

¶ 5     As a result of the collision, Johnathon Ode died. Evan Cortez suffered injuries of a broken femur, fractured sternum, and fractured C7 vertebra.

¶ 6     Defendant was charged with two counts of aggravated driving under the influence of alcohol. Count 1 was charged under section 11-501(d)(1)(F) of the Code, aggravated DUI causing the death of Johnathon Ode. Count 2 was charged under section 11-501(d)(1)(C) of the Code, aggravated DUI causing great bodily harm or permanent disfigurement to Evan Cortez. In addition to the two aggravated DUI charges, defendant was charged with a third count of reckless homicide.

¶ 7     On February 20, 2020, defendant entered an open guilty plea to the two aggravated DUI charges in exchange for the dismissal of the reckless homicide charge. The matter proceeded to a September 11, 2020, sentencing hearing. Before calling its witnesses in aggravation, the State announced to the trial court that "we have provided the Court, in agreement with defense counsel,

105 statements by people, friends, family as well, to the Court for your review[.]" The State then called Johnathon Ode's father, Stephen, to give his victim impact statement.

¶ 8　He testified that his son was a senior at DeKalb High School at time of his death. On the night of the accident, their family had made dinner and sat down together to talk about their day and the days to come. Johnathon had spoken about how he was looking forward to his upcoming classes in the last semester of his senior year. At 6:30 p.m., Johnathon spent some time with his younger brother before leaving to spend the night with some of his friends. His younger brother, 15-month-old Louie, tried to follow him out the door before he brought him back into the house. The family said their goodbyes for what would be the final time. Stephen spoke about the devastation that followed being notified of the fatal accident that took Johnathon's life. He testified as to the experience of going to the coroner's office to see his child in the morgue. Directing his comments to defendant, Stephen stated

"I cannot put into words all the pain and sorrow that this even has caused me and my family. The pain, the fear, the emotional turmoil has kept me up at night wondering what life would have been.

[Defendant] stole that life from my son. I will never be able to get him back because of [defendant]. On that cold Tuesday night because of your decision, my son died on that road without his family.

I was never given the chance to be with him in his last moments as he drew his last breath. I was never given the chance to comfort him as he passed away.

[T]he last time I would see my son would be in that body bag at the morgue, his hand ice cold, and I cried uncontrollably and kissed his forehead, telling him how much I loved him.

On top of all of this pain from your decision to get behind the wheel of your truck that night ***, you are responsible for putting my wife through the pain and grief as she battled her cancer.

These past three years at any point, you could have taken responsibility for your actions. Instead, you waited and dragged my wife and I through the turmoil of your criminal court proceedings. I've never heard an apology [for] your actions towards my son, my wife, or myself."

¶ 9      Karen Suggs then was called to read the victim impact statement of Johnathon Ode's mother, Katie. The statement recalled the morning of the accident and how Johnathon's younger brother took his first steps before Jonathan had woken up. She thought she would be able to tell him about this milestone later. She recalled the then-unremarkable dinner and family conversation before Johnathon left to be with his friends that night. Katie's statement detailed how much she loved her son, how devastated her life had become since losing him, what words of love she was never able to tell him, and how haunted she will be by the last image of him laying lifeless on the coroner's table. Katie's statement recalled her battling cancer and suffering a miscarriage in the year following Johnathon's death, causing her "stress like I'd never felt before in my life." Her physical ailments had worsened in that ensuing year as she had been diagnosed with Stage 4 recurrent metastatic melanoma almost exactly one year after the accident that killed her son. She described in detail her anger with defendant for his actions on the night of the accident. Katie's statement expressed

"I am anguished. I honestly felt that night I might lose my mind. I couldn't wrap my mind around the fact that Johnathon, my healthy and vibrant 18-year-old, was gone forever.

There are times that I feel the grief over losing Johnathon may swallow me up and leave noting behind. This is not sadness. Sad pales in comparison. This is cry until I can no longer breathe, cry at night when I lay down in bed, cry until it comes out as a scream and I have nothing left.

The sorrow I feel lies in the background as I care for Louie and try to be a good mother to him like an ever-present fog that threatens to roll over me with the slightest provocation.

I feel a deep sadness at the thought that my beautiful and now only child will never know his brother. The chance that Johnathon had to be in Louie's life is gone.

I am despondent at the *** thought that Johnathon will get no more birthdays, Halloweens, Thanksgivings, and Christmases, no more New Year's to celebrate. Johnathon will never fall in love, get married, and have children who would be my grandchildren. Johnathon's every chance, his every breath is gone. This causes me anguish."

¶ 10    Evan Cortez's mother, Patricia, then gave her victim impact statement. Patricia recalled receiving a call on the night of the accident that her son was in the hospital. She was able to speak to her son briefly, but all he could say was that he thought he had broken his leg while crying. She could tell from speaking to him that he was in a great deal of pain. On her way to the hospital with Evan's father, she called to speak with him again before being informed that Evan was a "level 1 trauma" and had to be transferred to another hospital. Patricia knew from her time working in an emergency department setting that "level 1 trauma" meant that her son had sustained life-threatening injuries. Doctors later informed Evan's parents that he suffered "a fractured sternum, a fractured hip, and a fractured femur." Evan's older brother arrived at the hospital shortly thereafter, and was in shock to see their sibling in that condition. Evan continued asking his family

about Johnathon's condition, but they had to delay the devastating news as he needed surgery to stabilize his femur and did not want to upset him any further. Just before the surgery, Evan asked his mother again about Johnathon. She finally told him, a decision Patricia described as "the single hardest thing I have ever had to do," and Evan started to cry. Following the successful surgery on Evan's femur, he underwent a painful healing process.

¶ 11    Patricia described how Evan was unable to finish his junior year of high school due to the extent of his injuries, and how she and her husband had to take lengthy absences from work to assist in his recovery. Evan had to spend six days total in intensive care before being moved to another hospital for an additional four days. She recalled from that time after the accident that Evan could not sit on his own, could not walk, or use the bathroom without assistance. Evan had to be transported by ambulance to a rehabilitation facility as he was too injured to travel safely by car. After days under a strenuous rehabilitation regimen, Evan was finally discharged and allowed to come home. However, Patricia recalled that her celebration at this news was brief as he still needs a lot of help in further recovery from his injuries.

¶ 12    The financial burden from the medical bills has caused a great impact on the Cortez family. Evan is nervous whenever he is in a car and does not trust other drivers on the road. He bears a permanent 8-inch scar in the middle of his chest, and frequent pain in his knee from where the rod keeping his leg together was inserted. Evan has subsequently begun to miss classes in school, telling his mother that he's "in a dark place right now and I don't know what to do." He expresses that he's deeply depressed since the accident.

¶ 13    Since the accident, the Cortez family has endured "immeasurable physical and emotional [loss], not to mention over *** $250,000 of medical bills and loss of income." Directing her comments to defendant, Patricia stated that

"Hearing after hearing, *** continuation after continuation, we never missed a court date, each one reopening a wound that was trying so desperately to heal, one just as painful as the next.

During every hearing, *** I never saw one ounce of remorse or regret or emotion *** from [defendant]."

Patricia Cortez implored the court to impose the maximum sentence on defendant.

¶ 14    Following the close of the State's aggravation evidence, the trial court remarked that it "had an opportunity to read each and every letter that was provided" and further noted that it had read "the entirety of the Sentencing Advocacy Group of Evanston's material that they've prepared on behalf of [defendant's] social history."

¶ 15    Defendant then began to call his witnesses in allocution, beginning with life-long family friend, Thomas Smith. Smith testified that defendant participated in a variety of different community events and church groups throughout his life. He also knew defendant to volunteer his time with the Special Olympics, nursing homes, and other charitable organizations. He recalled defendant's zeal for being employed as a firefighter and paramedic, testifying that he displayed the characteristics of someone who has been an asset to the community. Smith stated that defendant, in his role as a firefighter and paramedic, had "saved countless lives."

¶ 16    Scott Sutherland, Battalion Chief for Fox River Fire/Rescue District, next testified for defendant. He described defendant as a person who has "no hesitation to get in there and get himself dirty" in his work as a firefighter. Defendant had delivered babies and revived many people from drug overdoses. Sutherland stated that he would "hire [defendant] back in a second," if given the opportunity.

¶ 17    Defendant next called Daniel Ciullo, a mentee of defendant, to testify. Ciullo testified that he had met defendant in a church depression support group. He believed defendant to be sincere in his remorse for his actions as he had been with defendant when he would cry on Ciullo's shoulder and pray for the grace of God following the fatal accident. Ciullo testified that defendant "inspired me to clean up my act" and that he was "alive again because of [defendant]."

¶ 18    Nicole Busker, defendant's sister, then testified. She spoke of her and defendant's volunteer work at hospitals, the Special Olympics, and other charities for the last 20 years. She described defendant as a "pure gentleman" with a "golden heart." Busker said that defendant was always giving with his time and stood up for what's right, including standing up to bullies in high school to protect those with certain disabilities. Busker concluded that defendant was a role model for her own children and had sought guidance through his faith since the accident.

¶ 19    Finally, defendant made his own statement in allocution. He read to the court as follows:

"To everyone involved, from the bottom of my heart, I'm sorry. I'm so very sorry. I can't even begin to imagine the pain that was caused from this accident. If I could trade places with [Johnathon Ode] and take away all the pain and suffering, I would. I'm so sorry. Saying that this was an accident and that I never imagined I would hurt people this deeply won't change the fact that I did, and I understand that, and I can't change the past, but I will use it as a platform to continue to grow. I've gone my whole life with an affinity toward helping others, and for the first time I now am the cause of great harm. The deep regret and feelings that I have from this harm allow me to stand before you and your Honor to assure you I will not be a statistic of recidivism ***. During this unfortunate accident, the regret, remorse, and sadness that I feel, I've been carried through by the love of God, family, [and] faith ***. I will continue to pray for peace for all those affected, and I know

if given the chance, I will continue to do my part and raise awareness in the community to help prevent future accidents from occurring."

¶ 20    In its findings before defendant's sentencing, the trial court detailed the factors in aggravation and mitigation. As to mitigation, the trial court found that defendant had no history of prior delinquency or criminal activity. It found that his criminal conduct was the result of circumstances unlikely to recur, and that the character and attitude of defendant indicated that he is unlikely to commit another crime. As to factors in aggravation, the trial court found that defendant's conduct caused or threatened serious harm. Further, the trial court found that a sentence of imprisonment was necessary to deter others from committing the same offense.

¶ 21    The trial court made a specific finding that "extraordinary circumstances do not exist and do not require probation. The events that occurred that day were not rare. Unfortunately, they are events that are woven into the fabric of our everyday life." Defendant was sentenced to concurrent terms totaling six years' imprisonment.

¶ 22    On September 18, 2020, defendant filed a motion to reconsider sentence. The motion argued that the voluminous number of letters, 88 of which were "verbatim form letters submitted by MADD," were not appropriate at sentencing and "only served to place pressure of the Court, not to represent the victim under 720 ILCS 120/6." The motion further argued that the trial court, in issuing its findings at sentencing, erred in considering "the aggravating factor that the offense caused or threatened serious physical harm" as such consideration in aggravation constituted double enhancement of defendant's punishment. Finally, defendant's motion argued that the trial court erred in "not considering the plethora of information presented to determine extraordinary circumstances."

¶ 23    On December 9, 2020, the trial court held a hearing on defendant's motion to reconsider sentence. In denying defendant's motion, the trial court found that

"[T]he MADD letters "were basically form letters that were signed by people who *** have no idea about what happened here, let alone any idea as to the additional information that we had about [defendant's] background, about [Johnathon Ode's] background, and about [Evan Cortez's] background.

So *** I don't want to say *** I didn't give them zero weight, because I think I have to give everything some weight, but to the extent that they influenced the outcome of this matter, I would say, would be minimal to none in regards to this because *** it would be one thing *** if they were letters from members of the community who perhaps knew [defendant] and they were in his favor, or they were members of the community who knew [Evan Cortez] or [Johnathon Ode], talking about them, but these were literally form letters, and I gave them little if any weight."

As to defendant's argument regarding double enhancement, the trial court found that

"I do think that there's something to be said for great bodily harm and then really great bodily harm, and I think there are degrees of great bodily harm, and I think that to the extent that [Evan Cortez] experienced great bodily harm, he experienced great bodily harm at the high end of what great bodily harm would be considered. It was way past just enough to get over the hump of great bodily harm, and it was into the significant great bodily harm ***."

Regarding defendant's argument that the trial court erred in finding no extraordinary circumstances, the trial court stated

- 10 -

"[N]o matter how you define extraordinary circumstances, I don't think extraordinary circumstances were present under any definition to grant [defendant] probation.

And I guess *** [o]ne of the things I looked at in this case was *** there were two people involved in this case. It wasn't a single car crash in which one person just died and then that was the end of the case. Not only did we have an individual who died, we also had an individual who suffered great bodily harm.

And respectfully, defendant, of all people, of all people who should have known the risks they were taking as a paramedic/fireman, and you appear to have led an exemplary life up to that point, and I'm sure we all have some regrets in our life that if we could take back we would change those, and I have no doubt, [defendant], that if you could take back that two or three-hour window that this occurred in, you would, but we can't, and we can only learn from this an move forward.

And I think the fact that there were two people who were victimized as a result of this necessitates the six-year sentence that you received, and your motion to reconsider is denied."

¶ 24   Defendant then timely filed this appeal.

¶ 25                                    II. ANALYSIS

¶ 26   On appeal, defendant contends that the trial court erred in finding a lack of "extraordinary circumstances" pursuant to section 11-501(d)(2)(G) of the Code. Additionally, defendant contends that the trial court's findings in aggravation constituted double enhancement, and that it erred in allowing an excessive amount of victim impact statements. We address each of defendant's contentions in turn.

¶ 27    Defendant's first contention asserts that the trial court erred by misconstruing the meaning of "extraordinary circumstances" as articulated in section 11-501(d)(2)(G) of the Code. See 625 ILCS 5/11-501(d)(2)(G) (West 2020). He argues that established Illinois case law indicates that the phrase "extraordinary circumstances" contemplates mitigating factors, such as the life and character of a defendant, because "extraordinary circumstances" mitigate against a sentence of incarceration to a term of probation. Defendant avers that the sentence to a term of imprisonment, as opposed to probation, is greatly at variance with the spirit and purpose of section 11-501(d)(2)(G) of the Code, as well as manifestly disproportionate to the nature of the offense.

¶ 28    Before delving into our analysis of defendant's first contention, we note that defendant pleaded guilty to aggravated DUI resulting in the death of Johnathon Ode pursuant to section 11-501(d)(1)(F) of the Code. See 625 ILCS 5/11-501(d)(1)(F) (West 2020). He also pleaded guilty to aggravated DUI causing great bodily harm to Evan Cortez pursuant to section 11-501(d)(1)(C) of the Code. See 625 ILCS 5/11-501(d)(1)(C) (West 2020). His contention that the trial court misconstrued the meaning of "extraordinary circumstances" pursuant to 11-501(d)(2)(G) of the Code requires this court to examine the language of that section, which reads

"(G) A violation of subparagraph (F) of paragraph (1) of this subsection (d) is a Class 2 felony, for which the defendant, unless the court determines that extraordinary circumstances exist and require probation, shall be sentenced to: (i) a term of imprisonment of not less than 3 years and not more than 14 years if the violation resulted in the death of one person; or (ii) a term of imprisonment of not less than 6 years and not more than 28 years if the violation resulted in the deaths of 2 or more persons." 625 ILCS 5/11-501(d)(2)(G) (West 2020).

The plain statutory language contemplates the trial court's determination of the existence of "extraordinary circumstances" requiring probation following a conviction under section 11-501(d)(1)(F) of the Code. Defendant received a four-year sentence for his conviction of aggravated DUI causing great bodily harm to Evan Cortez pursuant to section 11-501(d)(1)(C) of the Code. As section 11-501(d)(2)(G) of the Code's language reduces defendant's first contention to his conviction and six-year sentence under section 11-501(d)(1)(F) of the Code for aggravated DUI causing the death of Johnathon Ode, his four-year sentence for aggravated DUI causing great bodily harm to Evan Cortez pursuant to section 11-501(d)(1)(C) of the Code must stand regardless of our further analysis on this contention.

¶ 29    Returning to defendant's first contention in this appeal, as noted above, he was convicted of aggravated DUI causing the death of Johnathon Ode, a Class 2 felony. 625 ILCS 5/11-501(d)(2)(G) (West 2020). A conviction of that offense carries a sentence of "not less than 3 years and not more than 14 years if the violation resulted in the death of one person" unless the trial court "determines that extraordinary circumstances exist and require probation." 625 ILCS 5/11–501(d)(2)(G) (West 2020). The plain language of the statute creates the presumption that a convicted defendant shall serve a term of imprisonment. 625 ILCS 5/11–501(d)(2)(G) (West 2020); see also *People v. Vasquez*, 2012 IL App (2d) 101132, ¶ 64. However, a trial court may override this presumption when it determines, in its discretion, that "extraordinary circumstances" require probation. *Vasquez*, 2012 IL App (2d) 101132, ¶ 64. The legislature intended for the "extraordinary circumstances" language to limit the discretion of a trial court to impose a sentence of probation. See *People v. Maldonado*, 386 Ill. App. 3d 964, 978 (2008).

¶ 30    A trial court, in determining the existence, or lack thereof, of "extraordinary circumstances," makes discretionary findings in reviewing the evidence and pronouncing the

defendant's sentence. *People v. Hambrick*, 2012 IL App (3d) 110113, ¶ 17. As such, we review the case for an abuse of discretion. *Id*. ¶ 18. This court may not alter a sentence unless the trial court abused its discretion by imposing a sentence greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Id*. ¶ 22. A trial court's sentencing decision is entitled to great deference, and we may not substitute our judgment for the trial court's merely because we might have weighed the sentencing factors differently. *Id*.

¶ 31 Section 11-501(d)(2)(G) of the Code has been interpreted to require both (1) extraordinary circumstances and (2) those extraordinary circumstances require probation. *Vasquez*, 2012 IL App (2d) 101132, ¶ 61. A defendant may present evidence of "*any* relevant extraordinary circumstances, whether it be extraordinary circumstances surrounding the offense, his or her life, or the combination of both." (Emphasis in original.) *Id.* ¶ 63. The circuit court then determines whether the defendant's evidence establishes circumstances so extraordinary that probation is required. *Id.*

¶ 32 In his appellate brief presented to this court, defendant argues that the trial court should have contemplated his life circumstances in its analysis of extraordinary circumstances. Specifically, defendant recounts the following character traits and life circumstances to support this argument:

"From being a religious and heroic first responder who has saved lives, delivered newborns, and brought the vulnerable back to life, to the sincere remorse that he expressed for the families involved, [defendant] is an extraordinary young man. With no criminal history of any kind, receiving the lowest score possible on the risk assessment, volunteering in various community outreach measures, and having the ARA recommend probation, [defendant's] life and character exemplify those of an extraordinary individual. Apart from

> [defendant's] exceptional life circumstances and sound character, the day in question revealed that [defendant], with his heroic tendencies, rushed to other vehicles to ensure the safety of everyone involved, despite having a broken leg"

Indeed, such a description of defendant's life paints him as a good person worthy of praise for past deeds. In amplifying his history as a fireman/paramedic in the brief presented to this court, defendant's counsel goes so far as to point out "Ironically, the sentencing hearing for [defendant], a renowned firefighter possessing admirable qualities, was held on September 11, 2020." The assertion that this court should consider defendant's past employment as a firefighter/paramedic with the same reverence as we would the first responders in New York City following the attack on the World Trade Center is preposterous. The mere fact that defendant had too much to drink, which destroyed the lives of two Illinois families, and his sentencing for such mayhem happened to fall on the 19th anniversary of a tragic American event, strikes this court as hyperbolic at best, disrespectful at worst. We will not consider such a desperate and disingenuous assertion in this analysis. In any event, the trial court considered all the legitimate assertions defendant made in finding a lack of extraordinary circumstances requiring probation. Not only did the trial court consider these things, but it also explicitly rejected them.

¶ 33   In its findings rejecting defendant's assertion of extraordinary circumstances requiring probation, the trial court stated

> "There are a couple of things that struck me when I was preparing for today in regard to the social history report prepared on behalf of the defendant, and [defendant's counsel] commented on this in his argument, and I'm troubled by it, [defense counsel].
>
> Specifically on page 16 of the report, and again you commented on this, they've actually even highlighted in this presentence *** investigation prepared on behalf of the

defendant, despite his own injuries, [defendant] tried to help [the victims] at the scene of the accident.

I appreciate the fact that he may have tried to help them at that time. However, I would note had it not been for him, there would have been no help that was necessary at all. It was his actions that brought us to this occasion."

The trial court went on to find that defendant's arguments as to extraordinary circumstances were an attempt to downplay and minimize his conduct. To wit:

"I would also note in regard to that section [of defendant's sentencing exhibit], they indicate that on the 17th, [defendant] had been out for beers with a colleague after work. To me, that was downplaying what actually occurred here. Let us not lose sight of the fact that ultimately the defendant's BAC was a .125, comfortably over the legal limit, somebody with your background should have known not to do.

We're here today because of the choices and the decisions that [defendant] made. [Defendant] made a choice to go to a bar and drink. You made a choice to have another beer. You made a choice to have another beer. You made a choice to have another beer after that. How many beers you ultimately had, I don't know, but you had a sufficient amount of alcohol in your system to register a .125."

¶ 34    *People v. Winningham*, 391 Ill. App. 3d 476 (2009), presented remarkably similar circumstances to those in the case at bar. In *Winningham*, the defendant was convicted following an open guilty plea to aggravated DUI causing death under section 11-501(d)(1)(F) of the Code. *Winningham*, 391 Ill. App. 3d at 477-78. At the defendant's sentencing hearing, he asserted that extraordinary circumstances existed requiring probations as the defendant

"(1) did not have a criminal record, (2) was employed as a Williamsville fire department lieutenant, and (3) had saved numerous lives as a firefighter. After the accident, defendant (1) completed 50 hours of alcohol counseling and (2) continually expressed his sincere remorse and regret that his actions caused Teresa's death and her relatives' injuries. At defendant's request, the trial court admitted into evidence (1) a letter from counsel for Teresa's estate, which showed defendant's willingness to assist counsel's pursuit of a dramshop suit against the tavern where defendant had been drinking and (2) approximately 80 to 90 letters from family, friends, and firefighters describing defendant's positive impact on their lives." *Id.* at 478-79.

In rejecting the defendant's assertions of extraordinary circumstances requiring probation, the trial court stated, in pertinent part, the following:

"[The court] believe[s] that the efforts that [defendant] has engaged in since the time of the plea, and in fact, pleading guilty certainly [has] influenced the [c]ourt with the sentence, but *** [the court] can't find that the efforts that [defendant] has made to assist *** the decedent's family in their dramshop efforts rise to the level of extraordinary, and that leaves [the court] with *** [its] obligation *** to sentence * * * [d]efendant to a term of imprisonment in the Department of Corrections [DOC]. It isn't that [the court has not] given any consideration to the extraordinary life—[the court] shouldn't use that term, that's asking for reversal. It isn't that [the court has not] given any consideration to the circumstances surrounding [defendant's] life to this point. As [the court] indicated earlier, he has done a good job. He has been a good citizen to this point. But it always seems that we come back in these cases to the rock-bottom issue, and that is the need of deterrence and whether or not, [the court] believe[s], that any sentence other than a sentence to [DOC]

- 17 -

would deprecate the seriousness of this offense, and [the court] believe[s] that it does. [The court] believe[s] that for the folks out there who aren't in this room, whose attitude about alcohol abuse and driving may be altered by these circumstances, that maybe people [who] read about this sentence in the newspaper will understand that if you drink and drive and somebody is killed, that at least *** you should be expecting a sentence to [DOC]." *Id*. at 479.

¶ 35    The appellate court in *Winningham* determined that it was in the trial court's discretion to find that there were no "extraordinary circumstances." *Id*. at 484. In so concluding, the court stated

    "[O]ur review of the record from defendant's sentencing hearing belies his contention that "the trial court failed to give proper consideration to probation and whether extraordinary circumstances were present." Specifically, the court considered (1) the circumstances surrounding the accident; (2) the victim-impact statements of Teresa's family; and (3) defendant's (a) respect for the law, as evidenced by the lack of any criminal record, (b) making an open guilty plea, (c) willingness to assist Teresa's family in their civil suit, and (d) life circumstances. After carefully considering all of this, the court stated that the determining factor for its imposition of a three-year prison term was the need for punishment and deterrence.

    Given our highly deferential standard of review, we conclude that the trial court's imposition of the minimum prison sentence allowed by the sentencing statute was (1) not an abuse of its discretion and (2) entirely reasonable.
    ***

    Although the legislature has increased DUI penalties, the judiciary must do its part by recognizing the terrible consequences of this preventable crime and imposing

sentences—as the trial court did here—that will address the need to both punish offenders and deter future offenses. A person who makes the conscious and intentional decision to drive drunk presents an imminent danger to the public. [Citation.] Indeed, the extraordinary danger drunk drivers pose is a nationwide concern. [Citations.]

Illinois law does not prohibit drinking and driving; it prohibits drinking and driving *drunk.* There is a big difference between these two, and Illinois drivers are expected to understand that difference and conduct themselves accordingly. Thus, we agree with the trial court and the legislature that those who drive drunk must be on notice that, absent extraordinary circumstances, the penalty for depriving a person of her life as a result of drunk driving will be imprisonment.

In so concluding, we acknowledge that defendant, in the aftermath of this terrible case, expressed his sincere sorrow and heartfelt regret for what has transpired as a result of his conduct. Nonetheless, this sorrow and regret come too late ***. [Citation.]

DUI is not only deterrable, it is one of the most deterrable offenses because of the drinking required—and the time this drinking requires—before the drinker becomes drunk. Typically, the potential DUI defendant—sip by sip, swallow by swallow, drink by drink— becomes intoxicated with the full understanding and expectation that, at some point, he will get behind the steering wheel, drive drunk, and perhaps kill someone." *Id*. at 484-86.

¶ 36 Returning to the present case, the trial court considered defendant's arguments that extraordinary circumstances existed to require probation. It emphasized that his experience as a paramedic and firefighter should have made him aware of the potential consequences that his drinking and driving could, and indeed did, lead to. It specifically determined that defendant's characterizations of extraordinary circumstances were an attempt to minimize his own

responsibility for his conduct that took the life of Johnathon Ode and severely injured Evan Cortez. The trial court remarked that its consideration of defendant's background was a factor in not imposing the maximum sentence. These thorough considerations support the trial court's finding that there were no extraordinary circumstances presented to require probation, and we reject defendant's argument that the trial court misconstrued the meaning of "extraordinary circumstance" in its findings that none existed. We find no abuse of discretion in the sentence imposed pursuant to section 11-501(d)(2)(G) of the Code and affirm the trial court's determination.

¶ 37    We now move to defendant's contention that the trial court's findings in aggravation constituted double enhancement. He argues that the trial court erroneously considered Johnathon Ode's death and Evan Cortez's serious bodily injury in its findings in aggravation as death and great bodily injury were inherent in both of his aggravated DUI convictions.

¶ 38    A reasoned judgment as to the proper penalty to be imposed must be based on the particular circumstances of each individual case. *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 12. "Such a judgment depends upon many relevant factors, including the defendant's demeanor, habits, age, mentality, credibility, general moral character, and social environment, as well as the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant." *Id*. ¶ 12, quoting *People v. Saldivar*, 113 Ill. 2d 256, 268 (1986). These factors also include the defendant's criminal history, the defendant's potential for reform, and the recognized interest in protecting the public and in providing a deterrent. *Id.* "The trial court is in the best position to balance the appropriate factors and tailor a sentence to the needs of the case." *Id*., quoting *People v. Wilson*, 257 Ill. App. 3d 670, 704 (1993).

¶ 39    However, a factor implicit in the offense of which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. *Id*. ¶ 13. In other terms, a single

factor cannot be used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed. *Id*. This prohibition against double enhancements assumes that, in designating the appropriate range of punishment for an offense, the legislature necessarily considered the factors inherent in the offense. *Id.*, citing *People v. Rissley,* 165 Ill. 2d 364, 390 (1995).

¶ 40    Whether a trial court relied on an improper factor when sentencing a defendant is a question of law, subject to *de novo* review. *Id*. ¶ 14. There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning. *Id*. "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *Id.*, quoting *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009).

¶ 41    Defendant's reliance on *People v. Larson*, 2022 IL App (3d) 190482, to support his double enhancement contention is misleading. In *Larson*, the defendant was convicted of aggravated DUI under section 11-501(d)(1)(F) and section 11-501(d)(1)(C) of the Code following an accident that left one victim deceased and others with injuries. *Id*. ¶ 3. At sentencing, the trial court found that the defendant's conduct caused a victim's death as a factor in aggravation. *Id*. ¶ 18. On appeal, the *Larson* court held that the trial court's finding in aggravation was clear and obvious error because "death is implicit in the offense" and could "not be considered as a factor in aggravation." *Id*. ¶ 30-31.

¶ 42    We use "misleading" in our description of defendant's reliance on *Larson* because in his summary of that case's posture, he states that "the sentencing court erred in considering the victim's death as a factor in aggravation because the victim's death was a factor inherent in the offense of aggravated DUI." However, the *Larson* court's holding was based on the victim's death

being not only *a factor* considered in aggravation, but it was *the only factor* the trial court considered in aggravation. See *Id.* ¶ 31. The trial court in the present case made no such error in consideration of the factors in aggravation.

¶ 43     As to the trial court's finding in aggravation, it specifically found that two factors applied. It found that "defendant's conduct caused or threatened serious harm," and that the sentence was "necessary to deter others from committing the same offense." Both factors in aggravation were properly considered by the trial court as enumerated in section 5-5-3.2(a) of the Unified Code of Corrections. 730 ILCS 5/5-5-3.2(a)(1), (7) (West 2020). In finding that it would not be sentencing defendant to the maximum term of years allowed, the trial court recited several mitigating factors in consideration of defendant's sentence.

¶ 44     We are unclear as to which of the trial court's findings in aggravation that defendant takes specific issue with. Neither his motion to reconsider, nor his appellate brief cites any particular statement made by the trial court that was allegedly in error, except perhaps the consideration of the language contained in section 5-5-3.2(a)(1) of the Unified Code of Corrections. See 730 ILCS 5/5-5-3.2(a)(1) (West 2020).

¶ 45     The burden is on the defendant to affirmatively establish that the sentence was based on improper considerations. *Dowding*, 388 Ill. App. 3d at 943. In determining the exact length of a particular sentence within the sentencing range for a given crime, the trial court may consider as an aggravating factor the degree of harm caused to a victim, even where serious bodily harm is arguably implicit in the offense of which the defendant is convicted. *Id.* The trial court may also consider the way the victim's death was brought about, as well as the seriousness, nature, and circumstances of the offense, including the nature and extent of each element of the offense. *Id.* Our review of the trial court's lengthy findings reveals no obvious error in its statements regarding

aggravating factors and do not support defendant's contention that those findings constituted double enhancement.

¶ 46     We now move to defendant's final contention in which he avers that the trial court erred in allowing the State to introduce 105 victim impact statements. He argues that the allowance of this number of statements is in direct violation of the Rights of Crime Victims and Witnesses Act (Act). 725 ILCS 120/6 (West 2020). The State counters that defendant has forfeited this contention as he agreed to the admission of all introduced victim impact statements, rendering any error invited. Although we tend to agree with the State's position, we will briefly analyze the argument presented by defendant.

¶ 47     The Act provides that, where a defendant is convicted of a motor vehicle offense resulting in great bodily harm or death,

> "[a] representative of the deceased person shall have the right to address the court regarding the impact that the defendant's criminal conduct has had upon them. *** [T]he court has discretion to permit one or more of the representatives to present an oral impact statement. *** The court shall consider any impact statement presented along with all other appropriate factors in determining the sentence of the defendant." 725 ILCS 120/6(a-1) (West 2020).

The Act defines a "Representative" as including "the spouse, guardian, grandparent, or other immediate family or household member of an injured or deceased person." 725 ILCS 120/6(a-1) (West 2020). Defendant again cites to *Larson* as support for his argument, this time for his assertion that the plain language of the Act renders the allowance of victim impact statements in the present case error and cause for a new sentencing hearing. We disagree.

¶ 48    In *Larson*, 16 victim impact statements were introduced at the defendant's sentencing hearing. *Larson* 2022 IL App (3d) 190482, ¶ 11. The statements were all from friends and family of the victims and were read aloud in open court, often over the defendant's objection. *Id*. ¶¶ 11-13. On appeal, the *Larson* court held that the victim impact statements allowed were unauthorized by the Act and should not have been admitted because they constituted an "interminable parade of victim impact statements." *Id*. ¶¶ 34-40. The *Larson* court stated that trial courts are

"[o]bligated to bar any statements by nonrepresentatives, to exercise discretion with respect to any additional victim impact statements beyond those specifically provided as a right under the Act, and to limit any statements made to the impact of the offense upon the author of the statement. The court is no less obligated and no less constrained by the Act when a defendant fails to raise an objection." *Id*. ¶ 40.

¶ 49    In the present case, the statements complained of by defendant could not be considered an "interminable parade of victim impact statements," as the record illustrates that the trial court put virtually no weight on their admission in imposing sentence. The statements were from people associated with Mothers Against Drunk Driving (MADD) and focus on the need to deter others from committing the same crime as defendant. During the sentencing hearing, the trial court has broad discretion to consider any reliable and relevant evidence. *People v. Rose*, 384 Ill. App. 3d 937, 940-41 (2008). Deterring others from committing the same crime was a proper consideration before the court as a factor in aggravation. 730 ILCS 5/5-5-3.2(a)(7) (West 2020). And perhaps most importantly, in denying defendant's motion to reconsider sentence, the trial court explicitly described the weight of the letters from MADD associates. To wit:

"You know, the MADD letters were basically form letters that were signed by people who I would imagine have absolutely no idea about what happened here, let alone

any idea as to the additional information that we had about [defendant's] background, about Mr. Ode's background, and about Mr. Cortez's background.

So I didn't, I don't want to say I suppose I didn't give them zero weight, because I think I have to give everything some weight, but to the extent they influenced the outcome of this matter, I would say, would be minimal to none in regards to this because you know, it would be one thing *** if they were letters from members of the community who perhaps knew [defendant] and they were in his favor, or they were members of the community who knew Mr. Cortez or Mr. Ode, talking about them, but these were literally form letters, and I gave them little if any weight."

The trial court had the discretion to review the statements insofar as they related to deterrence of others from committing the same crime as defendant. Further, it is clear from the trial court's findings that the victim impact statements at issue here did not have any prejudicial impact on the imposed sentence.

¶ 50                                    III. CONCLUSION

¶ 51    We affirm the judgment of the circuit court of De Kalb County.

¶ 52    Affirmed.